IN RE: FYRE FESTIVAL LITIGATION          1:17-CV-03296 (PKC)

**CONSOLIDATED AMENDED**
**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiffs bring this action on behalf of themselves, and all others similarly situated, and file this Consolidated Amended Class Action Complaint against defendants Fyre Media, Inc. ("Fyre Media"), William McFarland ("McFarland"), Jeffrey Atkins p/k/a Ja Rule ("Atkins"), and Grant Margolin ("Margolin") (the foregoing shall collectively be referred to as the "Defendants") and DOE INVESTORS 1 through 15 inclusive; DOE INVESTORS 1 through 15, inclusive; DOE PROPERTY OWNER; and DOES 1 through 50, inclusive. Plaintiffs allege the following based on information and belief, the investigation of counsel, review of public documents, and personal knowledge as to the allegations pertaining to themselves.

<u>**INTRODUCTION**</u>

1.      This class action lawsuit seeks redress for Defendants' knowing failure to organize, prepare, and provide ticket purchasers and attendees of the Fyre Festival with the experience that the Defendants extensively promoted and marketed as being a luxurious, packaged music festival to take place on two consecutive weekends in April and May of 2017, on a private island in the

Bahamas featuring, among other things, "first-class culinary experiences and a luxury atmosphere,"[1] and "top notch food, luxurious lodging, and hot entertainment in a stunning locale."[2]

2. The Fyre Festival achieved media infamy in April and May 2017 when its attendees arrived on an island in the Bahamas to rain-soaked grounds, a canceled festival (Defendants cancelled the event on the first day), emergency tent shelters, and a scarcity of toilets. Defendants did not provide a musical festival, or adequate food, shelter, basic amenities or medical care to attendees, which created a dangerous and panicked situation among attendees—suddenly finding themselves stranded on an island without basic provisions—that was closer to "The Hunger Games" or "Lord of the Flies" than Coachella. Festival-goers survived on bare rations, little more than bread and a slice of cheese, and tried to escape the elements in the only shelter provided by Defendants: small clusters of "FEMA tents," exposed on a sand bar that were soaked and battered by wind and rain.

3. Defendants shamelessly lured festival-goers into an unplanned, unorganized, disaster-stricken area that was far from the reality that Defendants promised in their promotional advertising of the event. The Fyre Festival was publicly described as a "complete disaster," "mass chaos," and a "post-apocalyptic nightmare."

4. Attendees' efforts to escape the unfolding disaster were hamstrung by their reliance upon Defendants for transportation, as well as that Defendants promoted the Fyre Festival as a "cashless" event—Defendants had instructed attendees to upload funds to a cashless wristband, dubbed a "FyreBand", for use at the Fyre Festival rather than bringing any cash. As such, attendees were generally unable to purchase basic transportation on local taxis

---

[1] Fyre Facebook: https://www.facebook.com/fyrefestival/
[2] https://www.bloomberg.com/news/articles/2017-05-02/the-inside-story-of-how-fyre-festival-went-up-in-flames

or buses.

5.      As a result, Plaintiffs were not only misled and defrauded by the Defendants' false representations of the Fyre Festival, but also were stuck on an island to fend for themselves.

6.      Defendants were well aware that they were ill prepared for the Fyre Festival, which resulted in the horrid conditions in which Plaintiffs and class members suffered, and Defendants knowingly lured attendees with false and fraudulent pretenses. Defendants knew the Fyre Festival was going to be a colossal failure that would place the lives of attendees in danger for weeks if not months in advance. Individuals engaged by Defendants and others have since acknowledged that no infrastructure for food service or accommodations was in place—the island was totally barren— that the few contractors who had been retained by Defendants were refusing to work because they had not been paid and that music performers had never been contracted and/or never paid, or told by the Defendants not to attend.

7.      In the weeks before the Fyre Festival was to begin, Defendants, aware that the Fyre Festival could not go forward, began reaching out to performers and celebrities in advance of the Fyre Festival and warned them not to attend—acknowledging that the Fyre Festival was outrageously underequipped, their lack of preparation, and the dangerous situation they had created.

8.      Defendants did not extend this warning, however, to Plaintiffs and other consumers.  Hordes of attendees arrived at Great Exuma in the Bahamas and were met with a chaotic and unsafe encampment. Thus, at the same time that Defendants knew that the Fyre Festival would be a disaster and were knowingly lying about the Fyre Festival's accommodations and safety and advising performers not to attend, Defendants continued to heavily promote the event and sell ticket packages and were aware that Class members were incurring expenses, in

addition to ticket costs, and faced dangerous conditions because of Defendants' greediness for ticket sales and money. In particular, it has been reported that defendant Margolin, the chief marketing officer for the Fyre Festival, was the marketing person behind the entire event, was particularly eager to keep pushing ticket sales, while knowing that the Festival could not proceed as represented and having visited the site, and that he stated at meetings that he was a marketing genius and a prodigy, that the concerns about the Festival did not matter, and that they should continue to sell tickets. Margolin, Atkins and McFarland repeatedly ignored reports that there was no way that the Fyre Festival could take place due to lack of infrastructure and other insurmountable problems.

9. Ticket packages cost between approximately $1,000 and $12,500, which were to include, among other things, luxury accommodations, amenities and activities, including musical performances. Upon information and belief, ticket package prices increased above and beyond the aforesaid range as the event drew closer (some ticket packages surpassed $100,000). Upon information and belief, Defendants sold many thousands of ticket packages to their festival.

10. Attendees suffered financial damages associated with the purchase of the tickets and/or other expenditures associated with the Fyre Festival depending on the ticket package purchased and purchases made in connection with the Fyre Festival and their attempts to return home safely and expeditiously. Ticketholders in route to the vacation of a lifetime found themselves stranded when the event was abruptly cancelled on the first day due to inadequate preparation. Not only did ticketholders and attendees shell out thousands of dollars to purchase tickets to the event, but in order to attend the event, they were required to make transportation arrangements to Miami, where festivalgoers would then board a flight to the purported private island in the Exumas. Once the event was abruptly cancelled, ticketholders were left to fend for

themselves. Nevertheless, Defendants failed to warn attendees about the dangerous conditions awaiting them on the island. Defendants only "cancelled" the event on the morning of the first day—after thousands of attendees had already arrived and were stranded, without inadequate food, water, or shelter.

11.     The cancellation of the Fyre Festival did not leave just the festival-goers in the Bahamas scrambling, but left the individuals who were planning to attend the festival the second weekend scrambling as well. Considering all attendees of the second weekend were required to be in Miami, the attendees of the second weekend (outside of those that may live in South Florida) had airline tickets and, for many, hotel lodging in Miami that were now useless. Attendees and those that were planning to attend had also expended money through their cashless wristbands.

12.     Outrage spread quickly on social media and throughout traditional news outlets, with the New York Times, the Los Angeles Times, the Washington Post, Vanity Fair, and others describing the dangerous events unfolding. Social media users even generated the hashtag "#fyrefraud" to share their harrowing experiences while in Defendants' care.

13.     This outrageous failure to prepare, coupled with Defendants' deliberate falsehoods in promoting the island "experience," demonstrates that the Fyre Festival was nothing more than a get-rich-quick scam. Defendants intended to fleece consumers for hundreds of millions of dollars by inducing them to fly to an island without food, shelter or water—and without regard to what might happen to them after that.

14.     The Fyre Festival itself was merely a front for a massive financial fraud. Comcast Ventures considered investing $25 million in Fyre Media, which defendant McFarland apparently hoped would allow him to finance the Fyre Festival, but declined days before the event following

due diligence review and the failure of Fyre to provide critical financial information."[3] After the Comcast Ventures deal fell through, a mere two weeks before the festival was to begin, defendants McFarland and Atkins had obtained multimillion dollar temporary financing for Fyre, that they each personally guaranteed, through an investor that required the company start repaying the loan before the Festival and from receipts of items associated with the Festival. This may have been primary motivation for Defendants, particularly McFarland and Atkins, who were personal guarantors of this sizable loan and who did not want to be straddled with repaying the loan, proceeding with the Fyre Festival knowing that they could not deliver what had been advertised. At or about this time, Defendants even increased the ticket prices, and pushed for consumers to make sizable purchases on their FyreBands, all the while knowing that they could not provide attendees with what had been represented to them, and with McFarland and Atkins acting primarily for their own interest and pockets.

15.     Shortly after the Fyre Festival debacle, the FBI commenced an investigation and, in June 2017, defendant McFarland was arrested and charged with wire fraud in connection with a scheme to defraud investors in connection with the Fyre Festival.

16.     At the time of the arrest and charge, acting Manhattan U.S. Attorney Joon Kim said: "As alleged, William McFarland promised a 'life changing' music festival but in actuality delivered a disaster. McFarland allegedly presented fake documents to induce investors to put over a million dollars into his company and the fiasco called the Fyre Festival. Thanks to the investigative efforts of the FBI, McFarland will now have to answer for his crimes." Assistant Director-in-Charge William F. Sweeney Jr. said: "Under McFarland's direction, Fyre Media

---

[3] www.bloomberg.com/news/articles/2017-05-04/.Comcast Rejected Funding Days Before Doomed Fyre Festival.

created a promoter's marketplace for entertainment bidding. In addition to this initial business venture, McFarland went one step further in establishing a subsidiary of the company, Fyre Festival LLC. But in order to drive the success of both entities, as alleged, McFarland truly put on a show, misrepresenting the financial status of his businesses in order to rake in lucrative investment deals. In the end, the very public failure of the Fyre Festival signaled that something just wasn't right, as we allege in detail today."

17.    McFarland entered into a plea agreement in March 2018, pleading guilty to two counts of fraud in connection with the Fyre Festival, which is likely to result in prison and a fine of up to $300,000. His sentencing is scheduled for June 21, 2018. McFarland admitted in federal court during his plea hearing to defrauding numerous investors in Fyre Media, while, among other things, using false financial documents to inflate the value of the company and his own net worth. He told the court:  "I grossly underestimated the resources that would be necessary to hold an event of this magnitude. In an attempt to raise what I thought were needed funds, I lied to investors about various aspects of Fyre Media and my personal finances. Those lies included false documents and information." The criminal action against defendant McFarland is entitled *USA v. McFarland*, 17-cr-00600 (S.D.NY. 2017) (NRB).

18.    Fyre Festival LLC, a subsidiary of defendant Fyre Media, was placed into bankruptcy in 2017. The bankruptcy proceeding is entitled *Fyre Festival LLC*, 17-bk-11883 (MG).

19.    Plaintiffs bring this class action on behalf of all ticket buyers and/or festival attendees wronged by Defendants, and seek damages in excess of $100,000,000.00 on behalf of themselves and the Class.

## PARTIES

20.    Plaintiff Daniel Jung ("Jung") is, and, at all times relevant to action was, a resident of Los Angeles County, California, and a citizen of the State of California.

21.    Plaintiff Lauren Mainero ("Mainero") is, and, at all times relevant to action was, a resident of Denver, Colorado and a citizen of the State of Colorado.

22.    Plaintiff Matthew Herlihy ("Herlihy") is, and, at all times relevant to action was, a resident of Queens, New York and a citizen of the State of New York.

23.    Plaintiff Anthony Lauriello ("Lauriello") is, and, at all times relevant to action was, a resident of Brooklyn, New York and a citizen of the State of New York.

24.    Plaintiff Ritu Jutla ("Jutla") is, and, at all times relevant to this action was, a resident of New York, New York and a citizen of the State of New York.

25.    Plaintiff Hallie Wilson ("Wilson") is, and, at all times relevant to action was, a resident of Chicago, Illinois and a citizen of the State of Illinois.

26.    Plaintiff Zenovia Pittas ("Pittas") is, and, at all times relevant to this action was, a resident and a citizen of the United Kingdom.

27.    Upon information and belief, defendant McFarland is, and, at all times relevant to this action was, a resident of New York, New York and a citizen of the State of New York. Defendant McFarland was a founder, co-owner, and/or officer of Fyre Media and its subsidiary Fyre Festival LLC, and he organized and marketed the Fyre Festival.

28.    Upon information and belief, defendant Atkins, is, and, at all times relevant to action was, a resident of Saddle River, New Jersey and a citizen of the State of New Jersey. Defendant Atkins was a founder, co-owner, and/or officer of Fyre Media., and its subsidiary Fyre Festival LLC (a New York limited liability company),  and he organized, funded and/or

promoted the Fyre Festival and was responsible for overall business strategy, guiding creative and facilitating artist relations.

29. Upon information and belief, defendant Margolin is and, at all times relevant to action was a resident of New York, New York and a citizen of the State of New York. Defendant Margolin was the chief marketing officer for the Fyre Festival and organized, funded and/or promoted the Fyre Festival.

30. Upon information and belief, defendant Fyre Media, an entertainment booking company, is incorporated under the laws of the State of Delaware, headquartered in New York, New York, and was founded in 2015 by defendant McFarland and defendant Atkins.

31. Several notable "Seed Series," investors who appear to have actually provided the initial financing for Defendants to gin up and perpetuate their scheme.

32. A "Seed Series" investment is generally the first round of investment in a start-up before the company solicits the "Series A" round. It is not uncommon for "Seed Series" investors to have active roles, involvement, and control over the new company.

33. Here, the full extent, involvement, scienter, intent, and knowledge of the "Seed Series" investors remains largely unknown but is under continued investigation. For example, it remains unknown if the "Seed Series" investors were themselves defrauded by the founders, or if they had active roles in the fraudulent scheme but still continued to prop up the undercapitalized and fraudulent entity with the goal of defrauding attendees and "Series A" investors.

34. To the extent these Seed Series investors are themselves identified as aiding and abetting in this fraudulent scheme, these Seed Investors will be added as Defendants to this action. Until their full role and involvement is uncovered, these Seed Investors will not be individually named in this Consolidated Amended Class Action Complaint, and will remain as

DOE Investors 1-15. These Seed Investors, who include well-known and prominent individuals and corporations, have billions of dollars in assets to satisfy any judgment in this class action. By way of example, upon information and belief, the Seed Investors for Fyre Media., include, but are not limited to the following:

DOE 1: A self-directed IRA custodian, which was recently purchased by a bank traded on NASDAQ;

DOE 2: A Venture Capitalist run by a Managing Director named as one of Time Magazine's 100 Most Influential People in the World;

DOE 3: A socialite who is married to the Chief of Asset Management in one of the world's largest banks;

DOE 4: A social media personality

35. Further, any third-party, including but not limited to law firms, which facilitated or encouraged the preparation of private placement memoranda (PPMs) or similar offering memorandum, or tried to silence whistle blowers have and continue to be investigated for their conduct as DOE Defendants.

## **JURISDICTION AND VENUE**

36. The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because there are more than 100 Class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

37. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because at least one Defendant maintains its principal place of business in this District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial district, including

Defendants' marketing and sale of the tickets and other items from this District. Defendant Atkins does not dispute that venue is proper in this District and agreed to transfer this action to this District.

## FACTUAL BACKGROUND

### The Founding, Marketing and Advertising of the Fyre Festival

38.     Defendants organized Fyre Festival as a luxurious, celebrity endorsed musical festival. According to the Fyre Festival's website, the Fyre Festival was an event conceived by McFarland and Atkins after development of "a partnership over mutual interest in technology, the ocean, and rap music." McFarland and Atkins retained Grant Margolin, a self-proclaimed marketing prodigy, as Chief Marketing Officer, to actively work with them as a lead member of the "FyreSquad", and as lead marketer, to promote the Fyre Festival. Defendants started promoting the Fyre Festival in December 2016 through a social media blitz, using, among other things, Instagram, Twitter and Facebook, which created a facade that the Fyre Festival would be filled with exclusive culinary experiences and famous models on yachts on a private island once owned by Pablo Escobar.

39.     Scheduled to take place over two weekends (April 28-30, 2017 and May 5-7, 2017), Defendants touted and represented their festival as "the cultural experience of the decade," featuring A-list entertainers like Blink-182, Migos, Rae Sremmurd, and Major Lazer, "first-class culinary experiences and a luxury atmosphere,"—all taking place on a "private island" in the Bahamas once owned by drug kingpin Pablo Escobar.[4]

40.     Defendants invested enormous amounts of time and money in promoting and advertising their festival domestically and internationally. They engaged hundreds of online

---

[4] Fyre Facebook: https://www.facebook.com/fyrefestival/.

"influencers" called "Fyre Starters"—including Kendall Jenner, Bella Hadid, and Emily Ratajkowski—to promote the Fyre Festival and use social media to generate ticket sales, and created extravagant websites and mock-ups of the luxurious villas in which attendees would be staying.

41.     As set forth more fully in the Pitch Deck provided to Fyre Festival investors, attached hereto as Exhibit "A," to "ignite" the Fyre Festival, Defendants "compiled 400 of the most influential personalities globally to launch a coordinated influencer marketing campaign." These influential personalities were dubbed "Fyre Starters."

42.     To announce the Fyre Festival, at the request of the Defendants, the Fyre Starters posted to their social media accounts an ambiguous orange tile. According to the Pitch Deck, this advertisement reached over 300 million people in 24 hours.

43.     Other posts soon followed sensationalizing and promoting Fyre Festival as a two-weekend A-list experience with alcohol, fine dining and party-goers. Furthermore, attendees were promised activities such as boats and jet skis for rent, and musical performances by bands such as Blink-182 and Major Lazer. Ticketholders were also told they could "start each day with morning yoga and guided meditation on the beach," while also enjoying "massages, henna tattooing, sound healing, chill-out sessions and a festive Bahamian junkanoo parade kicking off each weekend." Descriptions of the food options pledged "a uniquely authentic island cuisine experience," with "local seafood, Bahamian-style sushi and even a pig roast."[5]

44.     As part of the vast influencer marketing campaign, Defendants partnered with Kendall Jenner to announce the Fyre Festival's first headliners, and paid her $250,000. Within five days, she amassed approximately 6 million unique impressions, leading to an exponential

---

[5] https://www.nytimes.com/2017/04/28/arts/music/fyre-festival-ja-rule-bahamas.html

leap in website views and ticket purchases. The post featured models in bikinis walking along an idyllic white sand beach, and the caption of the post encouraged followers to "Get tix now" and to use Jenner's "promo code" for "VIP access for [Jenner's] followers."

45.     The advertisements from the vast influencer marketing campaign were widespread and directed toward consumers in all 50 states, the UK and globally.

46.     Almost all of the influencers who shared the promotional videos and photos never noted the posts were actually advertisements—despite the fact that the Federal Trade Commission requires social media users to clearly and conspicuously disclose their relationships to brands.

47.     Representations were also set forth in the FAQ section of Defendants' website. A copy of the FAQ section is attached hereto as Exhibit "B."

48.     As set forth in the attached FAQ, the following representations indicated that the Fyre Festival would comprise: • a culinary experience catered by celebrity chefs; • luxury eco-friendly domes and villas that will "feel just like a hotel" with the "comforts of home,", a depiction of which is attached hereto as Exhibit "C"; • musical bands that will be performing day and night; with an "all-star cast of performers, models, influencers, and thought leaders attending."

49.     Defendants also provided a video advertisement that further underscored these representations. The video can be found at: https://www.youtube.com/watch?v=kkovBKfcSJ8. Specifically, the video advertisement represented that the experience would entail "[t]he best in food, art, music and adventure." Defendants' marketed and promoted the Fyre Festival both nationally and internationally to raise ticket sales. Below are photos from the Fyre's Facebook promotional material:







50. Defendant Atkins also personally promoted the Fyre Festival on his own social media, touting how amazing the experience was going to be. An example of one of his Instagram posts promoting the Fyre Festival appears below, stating: "Fyre Festival looks set to be the biggest FOMO-inducing event of 2017." "FOMO" means "fear of missing out."



51. Defendants also represented the following about the Fyre Festival through the company's website, social media, promotional videos and other advertising, and through Instagram accounts:

a. The cultural experience of the decade.[6]

b. Pusha T, Tyga, and Desiigner will be joining Major Lazer, Disclosure, Blink-182, Migos, and Lil Yachty—and the models—Kendall Jenner, Alessandra Ambrosio, Bella Hadid, Hailey Baldwin, Emily Ratajkowski, Elsa Hosk, Lais Ribeiro, and Hannah Ferguson, to name a few...[7]

c. If you find yourself there with a ticket in hand, you'll also find yourself

---

[6] Fyre Promotional Video: https://www.youtube.com/watch?v=ANYqvbFsodw
[7] http://www.vogue.com/article/supermodels-fyre-festival-exumas-bahamas-guide

among some of the most incredible beaches and waters in the world.[8]

d. Famous models on yachts! Exclusive Island once owned by Pablo Escobar! Blink-182![9]

e. Tucked away you will find Pirates Cove, a secluded stage powered in partnership with Zero. Each Friday of Fyre Festival, experience a sunrise to sunset lineup of incredible electronic / deep house...[10]

f. G.O.O.D. Music. Major Lazer. Disclosure (DJ Set). And we are just getting started. Full lineup to be announced soon. Tickets are limited...[11]

g. Two transformative weekends.[12]

g. The best in food, art, music, and adventure.[13]

h. An immersive musical festival.[14]

i. Fyre is an experience and a festival.[15]

j. Limited availability [ticket sales].[16]

k. Plan a stopover at this private island to meet the pet sharks that belong to Compass Cay Marina. You read that right, sharks. There are about 30 of them that have become domesticated over time and the owner invites you to get in to "pet" them. So why not give caution a middle finger and jump in? Everyone else is doing it.[17]

l. You can plan an excursion with a local dive shop or pack your own mask and snorkel, either way, it's an underwater kingdom unlike any other.[18]

m. A brand-new luxury boutique hotel opened its doors, transforming this remote cay that resides just off the tip of Great Exuma. It's small, only 12 rooms, with a commitment to leaving as little of a footprint as possible. There are morning yoga sessions overlooking the private beach, a spa, and two

[8] http://www.vogue.com/article/supermodels-fyre-festival-exumas-bahamas-guide
[9] Fyre Promotional Video: https://www.youtube.com/watch?v=ANYqvbFsodw
[10] ttps://www.facebook.com/fyrefestival/photos/pb.1474168822612993.-2207520000.1489716781./1595273133835894/?type=3
[11] Id.
[12] Fyre Promotional Video: https://www.youtube.com/watch?v=ANYqvbFsodw
[13] Id.
[14] Fyre Promotional Video: https://www.youtube.com/watch?v=ANYqvbFsodw
[15] Id.
[16] Fyre Promotional Video: https://www.youtube.com/watch?v=ANYqvbFsodw
[17] http://www.vogue.com/article/supermodels-fyre-festival-exumas-bahamas-guide
[18] Id.

restaurants serving distinctly Bahamian cuisine like conch fritters and freshly caught fish. Hop on a private boat that will shuttle you over, and then enjoy pristine white sand beaches all to yourself.[19]

o. While there are many upsides to owning your own boat, in the Exumas, the ability to anchor down on your own private sandbar has got to be at the top of the list. There are lots of them in these parts, scattered about the pristine turquoise waters. Musha Cay has one of the more popular sandbars, which means you'll have company, and many locals or repeat visitors keep their favorite sandbar on the down low, but do some poking around and you're sure to find a spot worthy of an afternoon and; though these islands are part of the Bahamas, this scattered string of pearls is way more barefoot and bronzed than cruise ships and coconut cocktails.[20]

### The Disastrous Fyre Festival

52.    Upon arriving at the Fyre Festival, Plaintiffs and attendees were surprised to see that the experience promised by Defendants fell substantially below the advertised expectations as shown in the photos below:



---
[19] http://www.vogue.com/article/supermodels-fyre-festival-exumas-bahamas-guide
[20] Id.



53.     As widely reported on social media and through news outlets, the Fyre Festival was a disaster immediately upon the attendees' arrival. The event was cancelled, there was no concert, and concert-goers' luggage was unceremoniously dumped from shipping containers and left for them to rifle through in order to find their personal belongings:





William N. Finley IV
@WNFIV

Follow

This is how Fyre Fest handles luggage. Just drop it out of a shipping container. At night. With no lights. #fyrefestival

5:56 PM - 27 Apr 2017

1,032    2,275

54.    Once there, the accommodations were clustered "FEMA tents" (pictured below right), wholly exposed to the elements, rather than the luxurious villas described in Defendants' promotional materials (pictured below left):



55.     With only unsecured tents as accommodations, rather than the promised villas, attendees had no secure area to store valuables and other personal items:



56.     Similarly, the "world-class cuisine" was nowhere to be found, replaced by meager rations that were in dangerously short supply:



57.     Even more troublingly, festival staff were nowhere to be found to address attendees' concerns. Defendants had advised consumers that the island would be "honoring American Standards for medical safety," and a "medical tent on the island with professional medical providers." This could not be further from the truth, other than that there was a sign for First Aid that was located inside a garage with only boxes, chairs and a water cooler. No medical team was present:



58.     Faced with the complete lack of even the most basic amenities, as well as no assistance from Defendants, festival attendees began to panic:







59. Predictably, attendees began attempting to leave the island en masse, but found themselves trapped—even locked inside an airport awaiting delayed flights:



60.　　Unfortunately, festival-goers were unable to escape the unfolding disaster because of their reliance upon Defendants for transportation, and because Defendants promoted the Fyre Festival as a cashless, using the cashless FyreBand at the festival rather than bringing any cash.

61.　　In another string of comments from attendees, numerous complaints were reported sharing a similar theme of false representations by the Defendants:

    a.　"Not one thing that was promised on the website was delivered," said Shivi Kumar, 33, who works in technology sales in New York, and came with a handful of friends expecting the deluxe "lodge" package for which they had paid $3,500: four king size beds and a chic living room lounge. Instead Ms. Kumar and her crew were directed to a tent encampment. Some tents had beds, but some were still unfurnished. Directed by a festival employee to "grab a tent," attendees started running, she said. "People were stealing beds out of other tents," she said. "It was just chaos. Nobody ever came in to check us in to our accommodations, if you can call it that, so they had no idea who was there and who wasn't." At one point in the evening, Ms. Kumar said, staff members dumped a bunch of unopened containers — like "Amazon shipment boxes" — at the site, and instructed concertgoers to rifle through them for anything that was missing from their tents. "It was everything from, like, bongos to floaties to sleeping bags," she said.[21]

    b.　Another attendee Trevor DeHass told ABC News that despite the Fyre Festival being promoted as an all-inclusive upscale weekend, he said that he and his friends were served two slices of bread, a slice of cheese and a small salad for dinner Thursday.[22]

    c.　"So Fyre Fest is a complete disaster. Mass chaos. No organization. No one knows where to go. There are no villas, just a disaster tent city," said ticket holder William N. Finley IV, who has been documenting it all on Twitter.[23]

    d.　Another guest added: "The "gourmet cuisine" this weekend was included in the ticket cost. We are being fed salads and ham and cheese sandwiches out of this tent."[24]

---

[21] https://www.nytimes.com/2017/04/28/arts/music/fyre-festival-ja-rule-bahamas.html?_r=0

[22] http://abcnews.go.com/Entertainment/fyre-festival-organizers-attendees-refunded-full/story?id=47103941

[23] http://www.msn.com/en-nz/news/other/its-like-a-horror-movie-bella-hadid-backed-fyre-festival-with-dollar12k-tickets-goes-very-wrong-as-angry-attendees-flood-twitter-with-complaints/ar-BBAuiWL

[24] http://www.msn.com/en-nz/news/other/its-like-a-horror-movie-bella-hadid-backed-fyre-festival-with-dollar12k-tickets-goes-very-wrong-as-angry-attendees-flood-twitter-with-complaints/ar-BBAuiWL

e. "That awkward moment when you think you're going to a music festival on a private island but it's actually the Hunger Games," added a third.[25]

f. "The barrage of complaints left the Caribbean's Fyre Festival trending worldwide, with Twitter users comparing the experience to a "horror movie" plot."[26]

**Defendants' Knew of the Falsity of Their Representations about the Fyre Festival**

62. The representations made and advertising promoted by Defendants about the Fyre Festival were false.

63. Defendants had been aware for months that their festival was dangerously under-equipped and posed a serious danger to anyone in attendance. They had no planned medical services, few showers, no electricity, few porta potties, and none of the activities they had promised.

64. Individuals employed by Defendants have since acknowledged that no infrastructure for food service or accommodations was in place as recently as a month before the event and that the few contractors who had been retained by Defendants were refusing to work because they had not been paid.

65. Defendants knew that the event site did not have the proper infrastructure and would have to be built from the ground up. There had been no infrastructure in place for electricity (let alone promised wifi) or sanitation. As alleged herein, upon the arrival of guests to the island of Great Exuma for the first weekend, the island was lacking basic amenities and was covered in dirt. There were no luxurious accommodations previously promised by Defendants. The luxury domes were not being built, and instead were being replaced by tents and guests had

---

[25] http://www.msn.com/en-nz/news/other/its-like-a-horror-movie-bella-hadid-backed-fyre-festival-with-dollar12k-tickets-goes-very-wrong-as-angry-attendees-flood-twitter-with-complaints/ar-BBAuiWL

[26] http://www.msn.com/en-nz/news/other/its-like-a-horror-movie-bella-hadid-backed-fyre-festival-with-dollar12k-tickets-goes-very-wrong-as-angry-attendees-flood-twitter-with-complaints/ar-BBAuiWL

to sleep in tents with wet blankets. There were no communal showers or bathrooms as promised; instead there were porta potties (only about one for every 200 yards) that were knocked down and only three showers although there were hundreds of people arriving. Additionally, although Defendants had promoted the event as being on a private island, Great Exuma is not a private island. The event was held on a defunct landholding on Great Exuma that was semi industrial and semi manmade.

66.     The celebrity chefs had notified the Defendants they would not be appearing, and thus food was going to be served out of makeshift tents and included such items as bread and cheese sandwiches, side-salads, and pasta; clearly not the culinary experience that had been marketed by Defendants.

67.     Several weeks prior to the start of the Fyre Festival, Defendants approached Starr Catering Group to execute a food menu for festival. However, even after Starr Catering flew out to the Bahamas and created a plan detailing every meal, they were informed by the Defendants that a six-figure meal plan was out of budget. Before the event, Defendants terminated their contract with Starr to provide food for the festival, however they never informed attendees about this. Defendants still portrayed to attendees that the festival would be catered by Starr.[27]

68.     Bands had notified the Defendants that they would not be appearing due to the lack of progress, none of which was reported publicly by any of the Defendants despite all Defendants' knowledge of these facts. The bands' decisions were likely based upon the fact that the Defendants had not even secured a stage for the concert. There were also promises by all Defendants of security with local law enforcement, private contractors, and even the Bahamian army; none of which had been secured. In fact, there were ultimately reports of numerous

---

[27] https://www.bloomberg.com/news/articles/2017-05-02/the-inside-story-of-how-fyre-festival-went-up-in-flames

festival-goers being mugged, robbed, and otherwise terrorized by locals who were otherwise met with no resistance.

69.     None of the models who promoted the event, such as Bella Hadid, were on the island. Defendants knowingly and falsely represented to attendees that A-list artists and models were in fact coming to perform at the Fyre Festival. Defendants were obviously more concerned with promoting gloss ads featuring supermodels than securing the essential vendors to execute a food plan for attendees.

70.     Defendants, particularly Atkins, McFarland and Margolin, were aware of the problems before the event. Troublingly, before Plaintiffs and other ticketholders had arrived, Defendants urged artists to not attend due to the dangerous and uninhabitable conditions that were present at the event venue.[28]

71.     Defendant Atkins was certainly aware that the representations about the Fyre Festival were untrue. At least a month prior the event, in March 2017, defendant Atkins arrived for a "site visit." However most of his time was spent on a yacht near the supposed Festival site based upon his Instagram posts.[29] Upon his return from this "site visit," he shared whatever he saw (or didn't see) with the other Defendants.

72.     Meanwhile, before the commencement of the event, the event planners were attempting to put together a game plan and a budget. With so little having been prepared ahead of time, the official verdict was that it would take $50 million to pull off.

73.     Marketers for the event, engaged by Defendants, repeatedly made Defendants Margolin, McFarland and Atkins aware that the event would not be up to the standard they had advertised, something Defendants already knew or should have known and certainly could have

---

[28] http://www.businessinsider.com/fyre-festival-organizers-told-celebrities-not-to-attend-2017-5
[29] https://www.thecut.com/2017/04/fyre-festival-exumas-bahamas-disaster.html

discovered long before the marketing began. The best idea, the marketing team said, would be to roll everyone's tickets over to 2018 and start planning for the next year immediately. They had a meeting with the Defendants, within a month before the event, to deliver the news, wherein the warning was rejected and quote was stated, "Let's just do it and be legends, man." Defendants approved the budget and marketing for the event was to proceed even though Defendants knew that they could not deliver. Defendants Atkins and McFarland even toasted when it was known the festival would not be up to par, "To living like movie stars, partying like rock stars, and f****** like porn stars."[30]

74.     Defendant McFarland also knew that the Festival could not proceed as represented, but chose nonetheless to proceed. This goes along with McFarland's past conduct as he has a "history of overpromising" in his previous business ventures. For example, after McFarland sold tickets to the musical Hamilton for $430, the tickets were cancelled at the last minute. In a complaint to the Better Business Bureau, one customer seeking a refund reported getting no response to multiple queries over a month and a half. These circumstances are the same. Defendant Margolin, as alleged above, who was the lead marketing chief for the event, had also been warned and knew that the event could not proceed as represented.

75.     On or about April 10, 2017, a few weeks before the Fyre Festival, an entity known as EHL Funding LLC, extended a three million dollar loan for funding of the Fyre Festival and defendants Atkins and McFarland each signed personal guarantees, personally guarantying the loan. Payments on the loan were to commence on April 14, 2017, and on that date and each week thereafter, 40 percent of the receipts from the Fyre Festival were to be paid to EHL Funding. At or around of the time of the loan and personal guarantees given by Atkins and

---

[30] https://www.thecut.com/2017/04/fyre-festival-exumas-bahamas-disaster.html; http://lybio.net/ja-rule-billy-mcfarland-toast-festival-planning/people/

McFarland, Defendants pushed consumers to load up more and more money on the cashless FyreBands. Defendants Atkins and McFarland, personal guarantors on this loan, and founders, organizers and promotors of the Fyre Festival, clearly knew the Fyre Festival was under mountains of debt, in trouble, that their own finances were on the line, and could not proceed as represented. The loan was not fully repaid and EHL Funding commenced a lawsuit that is still pending to enforce the loan and guarantees. The action is entitled *EHL Funding LLC v. William McFarland, etc.*, 652546/17 (Supreme Ct., N.Y. Co).

76.     Nevertheless, Defendants failed to notify Plaintiffs, or any other consumers, that there were issues with the Fyre Festival moving forward or warn attendees about the dangerous conditions awaiting them on the island and even more vigorously marketed the event, raised prices and encouraged consumers to load up money on their cashless wrist bands.

77.     Defendants only "cancelled" the event on the morning of the first day—after thousands of attendees had already arrived and were stranded, without food, water, or shelter.

78.     While Plaintiffs are aware that Defendants made overtures shortly after the event regarding refunds and that Defendant Atkins stated on Twitter shortly after the event that "he was working to make it right by making sure everyone is refunded," Class members' damages exceed the face value of their ticket packages by many orders of magnitude.

79.     Plaintiffs and other Class members sustained damages as a direct and proximate result of Defendants' negligence and other wrongful conduct and omissions in connection with the sale of tickets to and other items associated with the Fyre Festival, and promotion of the Fyre Festival.

## Plaintiffs' Experience

80.     Plaintiffs and other Class members relied on Defendants' misrepresentations and omissions regarding the experience and accommodations. Plaintiffs, the Class, and the Subclasses (as defined below) have been damaged by Defendants' deceptive, negligent, and unfair conduct and wrongful inaction in that they purchased tickets for, and other items associated with, the Fyre Festival, that they would not have otherwise purchased, had Defendants not misrepresented the experience of attending the Fyre Festival or warned them of the potential harms caused by attending the event.

81.     Plaintiff Jung purchased a Fyre Festival ticket package from Defendants for approximately $1000, and further incurred approximately $1000 in additional costs associated with the cancellation of the Fyre Festival. Plaintiff Jung regrets buying a ticket package to the Fyre Festival.

82.     Plaintiff Mainero purchased a festival ticket from Defendants for $400, deposited $500 on the cashless wristband, and further incurred approximately $1,500 in travel expenses after the Fyre Festival, including flights to and from Miami, multiple day hotel stays in Miami after the Fyre Festival before she could fly home to Colorado, and meal, taxi and other expenses while in Miami.

83.     When Plaintiff Mainero arrived at the island, however, she did not arrive at a luxury festival.  After a few hours, there was chaos.  Attendees were screaming and crying out of fear.  It was pitch black and attendees were provided with only tents to sleep in. There were no villas. Some tents had beds and others did not.  Many of the beds did not have bedding or pillows. Most were soaking wet due to the rain storm the previous day.  Defendant McFarland was standing on a table yelling, just find a tent and we will figure it out.  Plaintiff Mainero slept in a

tent with her girlfriends, fellow festival attendees, who feared for their safety. Plaintiff Mainero and other attendees also had not been permitted to keep their luggage with them. Plaintiff Mainero therefore did not have access to her luggage on the day of arrival, was unable to use her sunscreen and was badly burned by the sun. After Plaintiff Mainero obtained her luggage, she kept passport with her in the tent. Upon waking the next morning, guests were rushed to the buses to leave the Fyre Festival, leaving Plaintiff Mainero without adequate time to retrieve items from her tent, including her United States passport. Her passport was ultimately stolen and she had great difficulty getting through customers to enter the United States. Plaintiff Mainero regrets buying a ticket package to the Fyre Festival.

84. Plaintiff Herlihy bought a ticket package for $1,027 from Defendants which was supposed to include a ticket to the Fyre Festival, roundtrip airfare to the Bahamas from Miami, Florida, luxury accommodations and food, and access to a number of activities, including musical performances.

85. When Plaintiff Herlihy arrived at the island, however, he saw total chaos. None of the musical performances or activities were available. There were no communal bathrooms or showers, but instead only three showers and a porta potty every 200 yards, which was woefully insufficient for the large number of festival attendees. The food was unappetizing and there were no on-site medical services. Additionally, there were no other basic amenities like soap, sunscreen and shampoo, and no electricity.

86. Plaintiff Herlihy arrived on Thursday night and departed the next evening. He had to spend the weekend in Miami where he had to incur additional expenses on food, which were supposed to be covered by the ticket package. He had also deposited $900 onto the cashless wristband that was supposed to be used to pay for activities and beverages on the island during

the Fyre Festival, and he did not have access to such monies after he left the island. Plaintiff Herlihy regrets buying a ticket package to the Fyre Festival.

87.     Plaintiff Lauriello bought a ticket package from Defendants for $1,027 which was supposed to include a ticket to the Fyre Festival, roundtrip airfare to the Bahamas from Miami, Florida, luxury accommodations and food, and access to a number of activities, including musical performances.

88.     When Plaintiff Lauriello arrived at the island, however, he saw mayhem. None of the musical performances or activities were available. He also found that there were no communal bathrooms or showers, but instead a few porta potties that were filthy, and woefully insufficient for the large number of festival attendees. The food was unappetizing and there were no on-site medical services. Additionally, there were no other basic amenities like soap, sunscreen and shampoo, and no electricity.

89.     Plaintiff Lauriello also arrived on Thursday night and then departed the next evening. He had to spend the weekend in Miami where he had to incur additional expenses on food, which were supposed to be covered by the ticket package. He had also deposited $1,000 on the cashless wristband that was supposed to be used to pay for activities and beverages on the island during the Fyre Festival, and he did not have access to such monies after he left the island. Unfortunately for Plaintiff Lauriello, his personal effects were stolen, including headphones, jeans and sneakers because Defendants failed to provide any security. Plaintiff Lauriello regrets buying a ticket package to the Fyre Festival.

90.     Plaintiff Jutla purchased a Fyre festival ticket package from Defendants for $1,940, deposited $600 on the cashless wristband, and further incurred $930 in travel expenses, including flights to and from Miami and hotel stays in Miami before and after the Fyre Festival.

Plaintiff Jutla incurred additional costs in additional airfare back to New York and hotel costs after Fyre Festival was cancelled. Plaintiff Jutla regrets buying a ticket package to the Fyre Festival.

91.     Plaintiff Wilson purchased a festival ticket from Defendants for $500, deposited $200 on a cashless wristband, and further incurred approximately $420 in hotel expenses and approximately $610 in travel expenses, including flights to and from Chicago to and from Miami. Plaintiff Wilson attended the Fyre Festival and the event was not the luxurious experience as advertised. Upon arrival on Thursday night, the hired driver of a bus (rather than a luxury transfer as advertised) drove Plaintiff Wilson and her friends - a bachelorette party – around for a while and eventually stopped in a parking lot. When she and her group asked him why they were stopping, he said he was told by the event founds to "stall them." Plaintiff Wilson and her friends could not find their luggage. Nor were there beautiful villas. Instead, Plaintiff Wilson and her friends found hundreds of tents lined up. Some of the tents were barren; others had simple bed frames and mattresses. Rather than luxury accommodations, there were two public outdoor showers in trailers and a couple of portable toilets. There was no water station. Attendees were not provided with locks to secure their valuables. There were not enough tents for all of the attendees and theft of tents and looting was rampant. The tents of Plaintiff Wilson and her friends were missing privacy flaps. Plaintiff Wilson and her friends could not leave their tents at the same time for fear of their tent being taken, so they took turns leaving to get food. The food was not gourmet food, but cheese sandwiches. At night, there were no lights. People were huddled around the only generator source to try to keep warm. Plaintiff Wilson and her friends headed back to the airport that evening but the wait to leave the Bahamas was extraordinarily long and her group did not depart until approximately 1:00 p.m. the next day. She and her friends, waiting

for their flights back to the United States, were locked into the airport waiting room at the airport for several hours with little to no air circulating and then stuck on the plane for several hours. During the time that Plaintiff Wilson and her friends were at the airport and on the plane, they were without food or water. Plaintiff Wilson regrets buying a ticket package to the Fyre Festival.

92.     Plaintiff Pittas purchased a Fyre Festival ticket package from Defendants for $1,940, deposited $600 on the cashless wristband, and further incurred approximately $2,950 in travel expenses, including flights to and from London to New York, New York to Miami, and hotel stays in Miami before and after the Fyre Festival. Plaintiff Pittas incurred additional costs in airfare back to New York and hotel costs after Fyre Festival was cancelled. Plaintiff Pittas regrets buying a ticket package to the Fyre Festival.

## CLASS ACTION ALLEGATIONS

93.     Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(b (2) and (b)(3), as applicable, and (c)(4). Upon information and belief, Defendants sold thousands of Fyre Festival tickets. The advertising and representations for the Fyre Festival tickets and associated items were uniform throughout the class period.

94.     Pursuant to Fed. R. Civ. P. 23(b) (2) and (b) (3), as applicable, and (c)(4), Plaintiffs seek certification of the following global class: All persons who purchased tickets to and/or attended the Fyre Festival (the "Global Class").  Alternatively, Plaintiffs seek certification of the following nationwide class: All residents of the United States of America who purchased a ticket to and/or attended the Fyre Festival.  (the "Nationwide Class") (the "Global Glass" and "Nationwide Class" shall be referred to as the "Class").

95.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs

seek certification on behalf subclasses for California, Colorado, Illinois, New York, and the UK, defined as follows:

(a) California Subclass: All California residents who purchased a ticket to and/or attended the Fyre Festival. ("California Subclass" or "California Subclass Member(s)").

(b) Colorado Subclass: All Colorado residents who purchased a ticket to and/or attended the Fyre Festival. ("Colorado Subclass" or "Colorado Subclass Member(s)").

(c) Illinois Subclass: All Illinois residents who purchased a ticket to and/or attended the Fyre Festival. ("Illinois Subclass" or "Illinois Subclass Member(s)").

(d) New York Subclass: All New York residents who purchased a ticket to and/or attended the Fyre Festival. ("New York Subclass" or "New York Subclass Member(s)").

(e) UK Subclass: All residents of the United Kingdom who purchased a ticket to and/or attended the Fyre Festival. ("UK Subclass" or "UK Subclass Member(s)").

The California. Colorado, Illinois, New York and UK Subclasses shall collectively be referred to as the "Subclasses."

96.     Excluded from the Class and Subclasses are persons who purchased the tickets for purposes of resale; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families. Plaintiffs reserve the right to redefine the proposed Class and the Subclasses if discovery and further investigation reveal that the Class and Subclasses should be expanded or otherwise modified. Plaintiffs reserve the right to establish additional subclasses as appropriate.

97.     This action is brought, and may properly be maintained, as a class action under

Fed. R. Civ. P. Rule 23 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable. This action satisfies the predominance, typicality, numerosity, superiority, and adequacy requirements of these provisions.

**(a) Numerosity:** The Class and Subclasses is so numerous that the individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class and Subclasses members is unknown to Plaintiffs at this time, upon information and belief, thousands of people purchased tickets for, and/or attended, the Fyre Festival.

(b) **Commonality**: Common questions of law and fact exist as to all members of the plaintiff class and predominate over any questions that affect only individual members of the Class and Subclasses. The common questions of law and fact include, but are not limited to:

(i)    Whether Defendants made false representations about the Fyre Festival, including misrepresenting the musical acts that would perform at the Fyre Festival and concealed, suppressed and omitted material facts, such as the island's inadequate infrastructure and the lack of preparedness of accommodating persons at the Fyre Festival, and whether Defendants created an unsafe environment for attendees;

(ii) If so, whether Defendants knew or should have known that their representations  were false or were reckless as to their veracity at the time they were made and their omissions material;

(iii) Whether Defendants negligently misrepresented various facts regarding the Fyre Festival or were otherwise negligent or grossly negligent; and

(iv) Whether Defendants breached any implied or explicit contractual obligations to ticket buyers and to attendees of Fyre Festival;

(v)    Whether Defendants violated various consumer protection statutes;

(vi) Whether Defendants created an unsafe environment at the Fyre Festival; and

(vii) Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class and Subclasses are entitled to damages, restitution and/or other remedies to which Class and Subclasses members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief.

(c) **Typicality:** Plaintiffs' claims are typical of the claims of the Class and Subclasses. Plaintiffs and the members of the Class and Subclasses sustained damages arising out of Defendants' wrongful and fraudulent conduct as alleged herein.

(d) **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs have no interest that is adverse to the interests of the other Class and Subclass Members.

(e) **Superiority:** A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the class is impractical, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to and burden on the court system of adjudication of individualized litigation would be substantial, and substantially more than the costs and burdens of a class action. Class litigation would also prevent the potential for inconsistent or contradictory judgments.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### (Negligence)

98.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

99.     Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendants.

100.    Defendants owed duties to Plaintiffs and the members of the Class and Subclasses as paying customers and attendees of the Fyre Festival to use reasonable care to provide true, reliable and safe accommodations. This duty existed because Plaintiffs and members of the Class and Subclass were the foreseeable and probable victims of the inadequate and unsafe environment that Defendants created. Defendants' duty also arose from their unique position of having unique and superior knowledge about the environment at the Fyre Festival.

101.    Defendants breached their duties to Plaintiffs and the members of the Class and Subclasses by failing to provide reasonable accommodations of food, water, shelter, security and medical supervision at the Fyre Festival, by failing to use reasonable care in properly organizing Fyre Festival with the proper vendors, by placing attendees into a dangerous environment, and by knowingly making false representations and concealing suppressing and omitting material information about the experience when the truth of the falsity was known.

102.    Plaintiffs and members of the Class and Subclass suffered foreseeable pecuniary and non-pecuniary damages associated with the Fyre Festival.

103.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and members of the Class and Subclasses, Plaintiffs and members of the Class and Subclasses would not have suffered pecuniary and non-pecuniary damages.

104.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the members of the Class and Subclasses incurred pecuniary and non-pecuniary damages, such as pain and suffering and emotional distress, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Gross Negligence)**

105.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

106.     Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendants.

107.     Defendants owed duties to Plaintiffs and the members of the Class and Subclasses as paying customers and attendees of the Fyre Festival to use reasonable care to provide true, reliable and safe accommodations. This duty existed because Plaintiffs and members of the Class and Subclasses were the foreseeable and probable victims of the inadequate and unsafe environment that Defendants created. Defendants' duty also arose from their unique position of having unique and superior knowledge about the environment at the Fyre Festival.

108.     Defendants breached their duties to Plaintiffs and the members of the Class and Subclasses by failing to provide reasonable accommodations of food, water, shelter, security and medical supervision at the Fyre Festival, by failing to use reasonable care in properly organizing Fyre Festival with the proper vendors, by placing attendees into a dangerous environment, and by knowingly making false representations and concealing suppressing and omitting material information about the experience when the truth of the falsity was known.

109.     Plaintiffs and members of the Class and Subclasses suffered foreseeable pecuniary and non-pecuniary damages associated with the Fyre Festival.

110.     But for Defendants' wrongful and grossly negligent breach of their duties owed to

the Plaintiffs and members of the Class and Subclasses, Plaintiffs and members of the Class and Subclasses would not have suffered pecuniary and non-pecuniary damages.

111.    Defendants' acts and omissions were wanton and in disregard of the rights of Plaintiff and members of the Class and Subclasses. Defendants knowingly and deliberately placed Plaintiffs and members of the Class and Subclasses in an inadequate or unsafe environment without adequate provisions.

112.    As a direct and proximate result of Defendants' gross negligence, Plaintiffs and the members of the Class and Subclasses, incurred pecuniary and non-pecuniary damages, such as pain and suffering and emotional distress, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Fraud)

113.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

114.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendants.

115.    As alleged herein, Defendants made numerous false representations of material fact with regard to the Fyre Festival.

116.    Specifically, Defendants represented, among other things, that:  (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

117.    Defendants' representations were false.

118.    Defendants knew these representations were false and intended that the

representations would induce the consuming public, including Plaintiffs and the Class and Subclasses, to act on these representations and to, among other things, purchase tickets to Fyre Festival and incur other related expenses in connection with the Fyre Festival.

119.     Defendants also concealed, suppressed and omitted material facts to the Plaintiffs and the members of the Class and Subclasses, that Defendants' had a duty to ticketholders and attendees to disclose, including, among other things, about the island's inadequate infrastructure, the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

120.     Plaintiffs and the members of the Class and Subclasses acted in reliance on the false, material representations and omissions made by Defendants, which caused them injury. Plaintiffs and the members of the Class and Subclasses would not have purchased tickets, deposited money onto the FyreBands and/or expended any other money in connection with the Fyre Festival if they had known that they were not going to be receiving the accommodations, amenities, security and access to activities that they were told they were going to experience at the Fyre Festival.

121.     Plaintiffs and the members of the Class and Subclasses were consequently injured when Fyre Festival was abruptly cancelled due to under-preparation and inadequate facilities and they did not receive and were not going to be receiving the accommodations, amenities, security and access to activities that they were told they were going to experience at the Fyre Festival.

122.     As a result of Defendants' fraudulent representations and omissions, Plaintiffs and the members of the Class and Subclasses were damaged in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**(Negligent Misrepresentation)**

123.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing

allegations as though fully set forth herein.

124.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendants.

125.    As alleged herein, Defendants made numerous false representations of material fact with regard to Fyre Festival.

126.    Specifically, Defendants represented, among other things, that:  (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

127.    Defendants' representations were false.

128.    Defendants were negligent in making the representations because they should they should have known the representations were false.

129.    Defendants intended for the representations to induce the consuming public, including Plaintiffs and the Class and Subclasses, to act on these representations and to, among other things, purchase tickets to Fyre Festival and incur other related expenses in connection with the Fyre Festival.

130.    Plaintiffs and the members of the Class and Subclasses acted in reliance on the false, material representations made by Defendants, which caused them injury. Plaintiffs and the members of the Class and Subclasses would not have purchased tickets, deposited money onto the FyreBands and/or expended any other money in connection with the Fyre Festival if they had known that they were not going to be receiving the accommodations, amenities, security and access to activities that they were told they were going to experience at the Fyre Festival.

131.    Plaintiffs and the members of the Class and Subclasses Class were consequently injured when Fyre Festival was abruptly cancelled due to under-preparation and inadequate facilities and they did not receive and were not going to be receiving the accommodations, amenities, security and access to activities that they were told they were going to experience at the Fyre Festival.

132.    As a result of Defendants' fraudulent representations and omissions, Plaintiffs and the members of the Class and Subclasses were damaged in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### (Breach of Contract/ Third Party Beneficiary)

133.    Plaintiffs reallege and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Consolidated Amended Class Action Complaint as though fully set forth herein.

134.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendant Fyre Media.

135.    Plaintiffs and the members of the Class and Subclasses entered into contracts with Fyre Media to provide a luxury festival experience in exchange for money. Plaintiffs who purchased tickets to, and other items associated with, the Fyre Festival provided payment in consideration for Fyre Media's promise to provide a luxurious music festival and otherwise fully performed their obligations under the contracts. Plaintiffs who attended the Fyre Festival with tickets purchased by others, and expended monies associated with the Fyre Festival, such as purchases made on the cashless wristband and travel and other accommodations, are third party beneficiaries of ticket purchasers' contracts as those contracts were made to benefit such attendees, and fully performed any obligations on their behalf.

136.    As alleged herein, Defendant Fyre Media breached the contracts with Plaintiffs

and the members of the Class and Subclasses by, among other things, failing to provide a luxury festival experience and providing substandard tents rather than the promised luxury accommodations and atmosphere, scarce food, no musical acts and ultimately a cancelled event.

137.    Plaintiffs and the members of the Class and Subclasses expended money to purchase their tickets and/or other items associated with the Fyre Festival.

138.    As a direct and proximate result of Defendant Fyre Media's breach of contract, Plaintiffs and the members of the Class and Subclasses were damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
### (Inducement of Breach of Contract)

139.    Plaintiffs reallege and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Consolidated Amended Class Action Complaint as though fully set forth herein.

140.    Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendants Atkins, McFarland and Margolin.

141.    Plaintiffs and the members of the Class and Subclasses directly or as third party beneficiaries entered into contracts with Fyre Media to provide a luxury festival experience in exchange for money. Plaintiffs provided payment in consideration for Fyre Media's promise to provide a luxurious music festival and otherwise fully performed their obligations under the contracts.

142.    By virtue of the actions and omissions alleged herein, Defendant Fyre Media breached the contracts with Plaintiffs and the members of the Class and Subclasses by, among other things, failing to provide a luxury festival experience providing substandard tents rather than the promised luxury villas, scarce food, no musical acts and ultimately a cancelled event.

143.     Based upon the actions and omissions alleged herein, Defendants Atkins, McFarland and Margolin induced Fyre Media to breach its contracts with the members of the Class and Subclasses by acting for their own interests, particularly as defendants Atkins and McFarland guaranteed a multimillion dollar loan which needed to be paid in substantial part before the commencement of the Festival,  and the easiest way to try to repay it was to collect money from consumers under false pretenses and fail to provide the experience for which consumers contracted

144.     As a direct and proximate result of Defendants' McFarland, Atkins and Margolin's inducement of breach of contract, Plaintiffs and the members of the Class and Subclasses were damaged in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

145.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

146.     Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendants.

147.     Plaintiffs and the members of the Class and Subclasses entered into direct and/or third party beneficiary contracts with Fyre Media to provide a luxury festival experience in exchange for money. Plaintiffs provided payment in consideration for Defendants' promise to provide a luxurious music festival and otherwise fully performed their obligations under the contracts.

148.     As alleged herein, Defendants' acts and omissions and failure to provide a luxury music festival as promised interfered with Plaintiffs and the members of the Class and Subclasses right to receive the benefits of the contracts and constituted a breach of its duty of good faith with

Plaintiffs and members of the Class and Subclasses.

149.     Plaintiffs and the members of the Class and Subclasses expended money to purchase their tickets and other items associated with the Fyre Festival.

150.     As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs and the members of the Class and Subclasses were damaged in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**(Unjust Enrichment)**

151.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

152.     Plaintiffs bring this claim individually and on behalf of the members of the Class and Subclasses against Defendants.

153.     By their wrongful acts and omissions regarding the Fyre Festival, as discussed above, Defendants were unjustly enriched at the expense of Plaintiffs and the members of the Class and Subclasses, who did not receive the benefit for which they were promised and they were entitled – as alleged in detail above – for attendance to a music festival, and thus, Plaintiffs and the members of the Class and Subclasses were unjustly deprived.

154.     It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation it obtained from its deceptive, misleading, and unlawful conduct alleged herein.

155.     Plaintiffs and the members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from its wrongful conduct.

## NINTH CAUSE OF ACTION
### (Violation of N.Y. Gen Bus. Law § 349, *et seq*.)

156.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

157.    Plaintiffs bring this cause of action on behalf of themselves and all of the members of the Class and the Subclasses as the deceptive practices with respect to the entire Class occurred in and emanated from New York, where Fyre Media and Fyre Festival were headquartered, and where the individual defendants resided, conducted business and/or had extensive ties.  Alternatively, Plaintiffs Herlihy, Lauriello and Jutla bring this cause of action on behalf of themselves and the New York Subclass.

158.    Plaintiffs and members of the Class and Subclasses are individuals that paid for Fyre Festival tickets and other items associated with the Fyre Festival for personal purposes.

159.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349 in the promotion of the Fyre Festival and sale of the Fyre Festival tickets and other items associated with the Fyre Festival, including by misrepresenting the characteristics, and qualities of the Fyre Festival as alleged herein,  such as representing that: (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

160.    Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349 by concealing, suppressing and omitting material facts, such as the island's inadequate infrastructure,

the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

161. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the characteristics and quality of the Fyre Festival.

162. Defendants acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiffs and the rights of the Plaintiffs and the Class and Subclasses.

163. As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiffs and the members of the Class and Subclasses have suffered and will continue to suffer injury and damages.

164. Defendants' deceptive and unlawful acts and practices complained of herein, affected the public interest and consumers at large.

165. The above deceptive and unlawful practices and acts by Defendants caused substantial injury to Plaintiffs and the members of the Class and Subclasses that they could not reasonably avoid.

166. Plaintiffs and members of the Class and Subclasses seek all monetary and non-monetary relief allowed by law, including, per class and Subclasses member, actual damages or statutory damages of $50 (whichever is greater), treble damages, attorney's fees and costs.

**TENTH CAUSE OF ACTION**
(California's False Advertising Law, Cal. Bus. & Prof. Code §17500, et seq.)

167. Plaintiff Jung repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein

168. Plaintiffs Jung brings this cause of action on behalf of himself and the members of the California Subclass.

169.     California's false advertising law ("FAL") (Bus. & Prof. Code §17500, et seq.) makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

170.     As alleged herein, Defendants made false and misleading statements in connection with the advertising of the Fyre Festival that are unlawful under the FAL including by misrepresenting the characteristics, and qualities of the Fyre Festival as alleged herein,  such as representing that: (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

171.     As alleged herein, Defendants made material omissions that are unlawful under the FAL by concealing, suppressing and omitting material facts, such as the island's inadequate infrastructure, the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

172.     Defendants knew or should have known, through the exercise of reasonable care, that their statements were untrue and misleading.

173.     Defendants' actions and omissions in violation of the FAL were false and misleading such that the general public is and was likely to be deceived.

174.     As a direct and proximate result of these acts and omissions, consumers have been and are being harmed.  Plaintiff Jung and the members of the California Subclass have suffered injury and actual out-of-pocket losses as a result of Defendants' FAL violation because: (a) Plaintiff  Jung and the members of the California Subclass would not have purchased tickets to the Fyre Festival and expended other sums of money associated with the Fyre Festival if they had known the true facts; (b) Plaintiff Jung and the California Subclass members purchased the tickets and expended other sums of money associated with the Fyre Festival due to Defendants' misrepresentations and omissions; and (c) the Fyre Festival did not have the level of quality, effectiveness, or value as promised.

175.     Plaintiff Jung and the members of the California Subclass seek all just and proper relief available under the FAL.

### ELEVENTH CAUSE OF ACTION
(California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.)

176.     Plaintiff Jung repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

177.     Plaintiff Jung brings this cause of action on behalf of himself and the members of the California Subclass.

178.     The Unfair Competition Law, Cal. Business & Professions Code § 17200, et seq. ("UCL"), prohibits any "unfair," "unlawful" or "fraudulent," business act or practice and any false or misleading advertising.

179.     The UCL, Bus. & Prof. Code § 17200 et seq., provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."  The UCL also provides for restitution for UCL violations.

180.    As alleged herein, Defendants made false and misleading statements in connection with the advertising of the Fyre Festival that are "unfair" or "unlawful" under the UCL, including by misrepresenting the characteristics, and qualities of the Fyre Festival as alleged herein,  such as representing that: (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

181.    As alleged herein, Defendants made material omissions that are unlawful under the FAL by concealing, suppressing and omitting material facts, such as the island's inadequate infrastructure, the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

182.    As alleged herein, Defendants' acts and practices constitute "unfair" or "unlawful" business acts and practices in that the harm caused by Defendants' wrongful conduct outweighs any utility of such conduct, and that Defendants' conduct: (i) offends public policy; (ii) is immoral, unscrupulous, unethical, oppressive, deceitful and offensive, and/or (iii) has caused (and will continue to cause) substantial injury to consumers, such as Plaintiffs and the members of the California Subclass.

183.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than Defendants' wrongful conduct and omissions described herein.

184.    The UCL also prohibits any "fraudulent business act or practice."  Defendants' above-described claims, omissions, and misleading statements were false, misleading, and likely to deceive the consuming public in violation of the UCL.

185.    As a direct and proximate result of Defendants' above-described wrongful actions, inactions, and violation of the UCL, Plaintiff Jung and members of the California Subclass have suffered injury and actual out-of-pocket losses because: (a) Plaintiff and California Subclass members would not have purchased tickets to the Fyre Festival and expended other sums of money associated with the Fyre Festival if they had known the true facts; (b) Plaintiff Jung and California Subclass members purchased tickets to the Fyre Festival and expended other sums of money associated with the Fyre Festival due to Defendants' misrepresentations and omissions; and (c) the Fyre Festival did not have the level of quality, effectiveness, or value as promised.

186.    Pursuant to Bus. & Prof. Code §17203, Plaintiff and the California Subclass are therefore entitled to: (a) an order requiring Defendants to cease the acts of unfair competition alleged herein; (b) full restitution of all monies paid to Defendants as a result of their deceptive practices; (c) interest at the highest rate allowable by law; and (d) the payment of Plaintiffs' attorneys' fees and costs.

## TWELFTH CAUSE OF ACTION
(California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750, et seq.)

187.    Plaintiff Jung repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein

188.    Plaintiff Jung brings this cause of action on behalf of himself and the members of the California Subclass.

189.    Plaintiff Jung and the California Subclass members are consumers who purchased tickets to, and expended other sums of money associated with, the Fyre Festival for personal, family, or household purposes. Accordingly, Plaintiff Jung and the other California Subclass members are "consumers" as that term is defined by the Consumers Legal Remedies Act

("CLRA") in Cal. Civ. Code § 1761(d).

190.    At all relevant times, the Fyre Festival constituted  "goods"  and "services" as those terms are defined in Cal. Civ. Code § 1761(a).

191.    At all relevant times, Defendants were "persons" as that term is defined in Civ. Code § 1761(c).

192.    At all relevant times, the purchases of tickets to and other items associated with the Fyre Festival, and the purchases of tickets to and other items associated with the Fyre Festival, by Plaintiff and the other California Subclass members, constituted "transactions" as that term is defined in Cal. Civ. Code § 1761(e). Defendants' actions, inactions, representations, omissions, and conduct has violated, and continues to violate the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of purchases of tickets to and other items associated with the Fyre Festival to consumers.

193.    As alleged herein, Defendants made false and misleading statements in connection with the advertising of the Fyre Festival including by misrepresenting the characteristics, and qualities of the Fyre Festival as alleged herein,  such as representing that: (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

194.    As alleged herein, Defendants concealed, suppressed and omitted material facts, such as the island's inadequate infrastructure, the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

195.    The acts, omission, practices and conduct described in this Consolidated Amended Class Action Complaint were material intended to and did result in the sale of tickets to and other items associated with the Fyre Festival to Plaintiff Jung and the California Subclass. Defendants' acts, omissions, practices and conduct violated the CLRA §1750 et seq.as alleged herein.

196.    As alleged herein, Defendants represented that the Fyre Festival had sponsorship, approval, characteristics, uses and benefits which it did not have in violation of Cal. Civ. Code § 1770(a)(5).

197.    As alleged herein, Defendants represented that the Fyre Festival was of a particular standard or quality when Defendants were aware it was of another, in violation of California Civil Code § 1770(a)(7).

198.    As alleged herein, Defendants violated California Civil Code §§ 1770(a)(5) and (a)(7) by their representations and omissions.

199.    As alleged herein, Defendants advertised the Fyre Festival with the intent not to sell it as advertised in violation of § 1770(a) (9) of the CLRA.

200.    Plaintiff Jung and California Subclass members suffered injuries caused by Defendants' misrepresentations and omissions because: (a) Plaintiff Jung and the other California Subclass members would not have purchased tickets to and expended other sums of money  if they had known the true facts; (b) Plaintiff Jung and  the other California Subclass members purchased tickets to and expended other sums of money associated with the Fyre Festival  due to Defendants' misrepresentations and omissions; and (c) the Fyre Festival did not have the level of quality, effectiveness, or value as promised.

201.    On April 18, 2018, Plaintiff Jung on behalf of himself and the California Subclass

sent via certified mail pursuant to Cal. Civ. Code. § 1782 written notice informing Defendants of the above violations and giving them an opportunity to cure or alter said practices. Defendants have failed to cure or respond to the written notice.

202.     Plaintiff Jung and the California Subclass seek damages, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), punitive damages under Cal. Civ. Code §3294 and any other applicable law, and any other just and proper relief available under the CLRA

## THIRTEENTH CAUSE OF ACTION
(Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101, et seq. 523).

203.     Plaintiff Mainero repeats, realleges, and incorporates by reference each of the foregoing allegations of paragraphs 1-166 as though fully set forth herein

204.     Plaintiff Mainero brings this cause of action on behalf of herself and the members of the Colorado Subclass.

205.     Each Defendant is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

206.     Each Defendant engaged in "sales" as defined by Colo. Rev. Stat. § 6-1- 102(10).

207.     Plaintiff Mainero and the Colorado Subclass members, as well as the general public, are actual or potential consumers of the products and services offered by Defendants to actual consumers.

208.     As alleged herein, Defendants made false and misleading statements in connection with the advertising of the Fyre Festival, including by misrepresenting the characteristics, and qualities of the Fyre Festival as alleged herein,  such as representing that: (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

209. As alleged herein, Defendants concealed, suppressed and omitted material facts, such as the island's inadequate infrastructure, the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

210. Defendants engaged in deceptive trade practices in the course of their business, in violation of Colo. Rev. Stat. § 6-1-105(1), by their material misrepresentations and omissions.

211. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the characteristics, and qualities of the Fyre Festival.

212. Defendants intended to mislead Plaintiff and Colorado Subclass members and induce them to rely on their misrepresentations and omissions.

213. Had Defendants disclosed to Plaintiffs and the Colorado Class members about the island's inadequate infrastructure, the lack of preparedness of accommodations and musical activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival, Plaintiffs would not have purchased tickets to and/or expended money in connection with the Fyre Festival.

214. Plaintiff Mainero and the Colorado Subclass members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

215. Defendants acted intentionally, knowingly, and maliciously to violate Colorado's Consumer Protection Act, and recklessly disregarded Plaintiff Mainero's and the Colorado Subclass members' rights.

216. As a direct and proximate result of Defendants' deceptive trade practices,

Colorado Subclass members suffered injuries to their legally protected interests, including their legally protected interest in the confidentiality and privacy of their personal information.

217. Defendants' deceptive trade practices significantly impact the public, as upon information and belief, thousands of tickets were sold, including to many Coloradans.

218. Plaintiff Mainero and the Colorado Subclass members seek all monetary and nonmonetary relief allowed by law, including, per Colorado Subclass member, the greater of: (a) actual damages, or (b) $500, or (c) three times actual damages (for Defendants' bad faith conduct); and reasonable attorneys' fees and costs.

**FOURTEENTH CAUSE OF ACTION**
(Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. §§ 505, et seq. 659)

219. Plaintiff Wilson repeat the allegations contained in paragraphs 1-166 above as if fully set forth herein.

220. Plaintiff Wilson brings this cause of action on behalf of herself and the members of the Illinois Subclass.

221. Each defendant is a "person" as defined by 815 Ill. Comp. Stat. §§ 505/1(c).

222. Plaintiff Wilson and the Illinois Subclass members are "consumers" as defined by 815 Ill. Comp. Stat. §§ 505/1(e).

223. Defendants' conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

224. As alleged herein, Defendants made false and misleading statements in connection with the advertising of the Fyre Festival, including by misrepresenting the characteristics, and qualities of the Fyre Festival as alleged herein, such as representing that: (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4)

the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

225.     As alleged herein, Defendants concealed, suppressed and omitted material facts, such as the island's inadequate infrastructure, the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

226.     Defendants' material representations and omissions constitute deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2.

227.     Defendants' representations and omissions were material because they were likely to deceive reasonable consumers the characteristics, and qualities of the Fyre Festival

228.     Defendants intended to mislead Plaintiff Wilson and the Illinois Subclass members and induce them to rely on their misrepresentations and omissions.

229.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

230.     Defendants acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiff and the Illinois Subclass members' rights.

231.     As a direct and proximate result of Defendants' unfair, unlawful, and deceptive acts and practices, Plaintiff and the Illinois Subclass members have suffered and will continue to suffer injury, and monetary and non-monetary damages.

232.     Plaintiff Wilson and the Illinois Subclass members seek all monetary and

nonmonetary relief allowed by law, including damages, restitution, punitive damages, and reasonable attorneys' fees and costs.

## FIFTEENTH CAUSE OF ACTION

(Illinois Uniform Deceptive Trade Practices Act 815 Ill. Comp. Stat. §§ 510/2, et seq.)

233. Plaintiff Wilson repeat the allegations contained in the paragraphs 1-166 and 219-232 above as if fully set forth herein.

234. Plaintiff Wilson brings this cause of action on behalf of herself and the members of the Illinois Subclass.

235. Each Defendant is a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

236. Defendants engaged in deceptive trade practices in the conduct of their business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including: a. Representing that goods or services have characteristics that they do not have; b. Representing that goods or services are of a particular standard, quality, or grade if they are of another; c. Advertising goods or services with intent not to sell them as advertised; and d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

237. Defendants' deceptive trade practices include making false and misleading statements in connection with the advertising of the Fyre Festival, including by misrepresenting the characteristics, and qualities of the Fyre Festival as alleged herein,  such as representing that: (1) the Fyre Festival would take place on a private island, (2) the island was previously owned by Pablo Escobar, (3) the Fyre Festival would have a luxury atmosphere and accommodations, (4) the line of up music guests were filled with celebrity performers, (5) the cuisine would be first class, and (6) the Fyre Festival would be filled with famous models on yachts.

238. Defendants' deceptive trade practices also include concealing, suppressing and

omitting material facts, such as the island's inadequate infrastructure, the lack of preparedness of accommodations and activities at the Fyre Festival, and that Defendants had created an unsafe environment at the Fyre Festival.

239.     Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about misrepresenting the characteristics, and qualities of the Fyre Festival.

240.     The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Wilson and the Illinois Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

241.     As a direct and proximate result of Defendants' unfair, unlawful, and deceptive trade practices, Plaintiff Wilson and the Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Personal Information.

242.     Plaintiff Wilson and the Illinois Subclass members seek all monetary and nonmonetary relief allowed by law, including reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks a judgment against Defendants, as follows:

A.      For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Subclasses and the undersigned lead-counsel as Class Counsel to represent the Class and Subclasses;

B.      For an order declaring that Defendants' conduct violates the statutes referenced herein;

C.      For an order finding in favor of Plaintiffs and the Class and Subclasses on all causes of action asserted herein;

D.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.      For prejudgment interest on all amounts awarded;

F.      For an order of restitution and all other forms of equitable monetary relief; and

G.      For an order awarding Plaintiffs and the Class and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: May 31, 2018                      Respectfully submitted,

By: *s/ Lori G. Feldman*
      Lori G. Feldman
**GERAGOS & GERAGOS, APC**
LORI G. FELDMAN (LF3478)
7 West 24th Street
New York, New York 10010
Telephone: (213) 625-3900

Facsimile: (213) 232-3255
lori@geragos.com

MARK J. GERAGOS (*pro hac vice forthcoming*)
BEN J. MEISELAS (*pro hac vice forthcoming*)
Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
geragos@geragos.com

*Lead Class Counsel for Plaintiffs*