**Sarah Heaton Concannon (SDNY Bar Code #SC9111)**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, N.E.**
**Washington, DC 20549**
**Telephone: (202) 551-5361**
**Facsimile: (202) 772-9282**
**Email: ConcannonS@sec.gov**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| **Plaintiff,** | : |
| **– against –** | : |
| **WILLIAM Z. ("BILLY") MCFARLAND** | : |
| **FYRE MEDIA, INC.** | : |
| **MAGNISES, INC.** | : |
| **GRANT MARGOLIN** | : |
| **DANIEL SIMON** | : |
| **Defendants.** | : |

<u>**COMPLAINT**</u>

**18-CV-6634**

**ECF CASE**

**JURY TRIAL DEMANDED**

-------------------------------------------------------------------------x

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges the following against defendants William Z. ("Billy") McFarland ("McFarland"), Fyre Media, Inc. ("Fyre Media"), Magnises, Inc. ("Magnises"), Grant Margolin ("Margolin"), and Daniel Simon ("Simon"):

<u>**INTRODUCTION**</u>

1.      From at least 2013 through 2017, McFarland—both directly and through Fyre Media and Magnises—fraudulently induced over 100 investors to invest more than $27.4 million in Fyre Media and Magnises, as well as in a third business founded by McFarland, Fyre Festival, LLC ("Fyre Festival"). McFarland engaged in a host of deceptive and fraudulent acts in furtherance of the offering scheme, including: (i) making material misrepresentations and omissions to investors

about the financial strength of each of the three companies; (ii) creating documents that fraudulently inflated key financial metrics, including revenue and income, at each of the three companies; (iii) altering a stock ownership statement to falsely suggest the existence of collateral for securitized investments in Fyre Festival; (iv) manufacturing a purported (but nonexistent) $35 to 40 million sale of Magnises to (among other purported buyers) a third party that did not exist; (v) falsely informing investors and potential investors that he would obtain event cancellation insurance for the Fyre Festival, and (vi) touting "exclusive,"—but, in fact, nonexistent— relationships with artists and talent.  McFarland provided falsified income statements and similar falsified financial documents to investors, who relied on them in making their investment decisions.

2.     Margolin, Fyre Media's Chief Marketing Officer ("CMO") and Magnises's Vice President of Marketing and Branding, and Simon, a contractor for each of McFarland's three businesses, negligently provided substantial assistance to McFarland with regard to certain aspects of the offering scheme.  Namely, Margolin and Simon created certain documents at McFarland's behest that inflated operational and financial metrics of Fyre Media and Fyre Festival, without inquiring into the accuracy of information provided to them by McFarland or exercising the care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise under the circumstances.

3.     McFarland's offering fraud and materially false and misleading statements and omissions were purposefully designed to make Fyre Media, Fyre Festival, and Magnises appear more successful and financially strong than they actually were, to tout McFarland's management expertise and oversight of Fyre Media, Fyre Festival, and Magnises, and to induce investors to invest tens of millions of dollars into McFarland's companies.

4.      Throughout the period of his fraud, McFarland received money, benefits, and perks, which enabled him to live an extravagant lifestyle, including maintaining a Manhattan residence, employing a private driver of a luxury vehicle, taking frequent trips by private plane, and making seemingly magnanimous donations to charitable interests and friends.  On information and belief, these activities were funded, in substantial part, with investor money.  McFarland also benefited from his fraud by falsely creating a reputation as a skilled entrepreneur, which gained him access to celebrities and premier events.  McFarland held tens of thousands of shares in Fyre Media and Magnises and stood to directly benefit from fraudulently inflating the worth of these companies.

5.       By engaging in the conduct described herein:

a.  McFarland, Fyre Media, and Magnises violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5].

b.  McFarland and Fyre Media violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e].

c.  McFarland violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

d.  Margolin and Simon violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.      In connection with the transactions, acts, practices, and courses of business

alleged herein, Defendants, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce or the mails.

8.      Venue is proper in the Southern District of New York pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred here and were effected, directly or indirectly, by making the use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  McFarland resides in New York, New York, within the Southern District of New York, and Fyre Media and Magnises had their principal places of business in New York, New York.  In addition, many of the investors in Fyre Media, Fyre Festival, and Magnises reside in New York, and much of McFarland's, Margolin's, and Simon's work was performed within this District.

## DEFENDANTS

9.      **William Z. ("Billy") McFarland**, 26, resides in New York, New York. McFarland is the founder, and, at all relevant times, was the Chief Executive Officer ("CEO") and controlling principal of Fyre Media, Fyre Festival, and Magnises.  McFarland is not now, and has never been, registered with the Commission in any capacity or associated with any registered entity.  McFarland was arrested on June 30, 2017 and charged via criminal information with multiple counts of wire and bank fraud for his criminal misconduct related to the promotion and fund-raising for Fyre Media and Fyre Festival.  On March 6, 2018, McFarland entered a guilty plea before the United States District Court for the Southern District of New York (Reice Buchwald, J.) as to two counts of wire fraud.  On June 25, 2018, McFarland was arrested and charged via criminal information with additional counts of wire fraud and money

laundering relating to alleged unlawful ticket sales and identity theft in which McFarland allegedly engaged while awaiting sentencing in the first criminal matter.

10. **Fyre Media, Inc.** is a privately-held Delaware corporation with its principal place of business in New York, New York. McFarland founded Fyre Media in 2016 to build a digital application that would enable individuals organizing commercial events, such as concerts, to bid for talent bookings at such events. Fyre Media has never been registered with the Commission in any capacity, and Fyre Media has never registered any securities offering with the Commission. On information and belief, on April 1, 2016, the board of directors of Fyre Media granted McFarland binding signing authority to conduct business on behalf of Fyre Media.

11. **Magnises, Inc.** is a privately-held Delaware corporation with its principal place of business in New York, New York. McFarland formed Magnises in 2013. On information and belief, the board of directors of Magnises disbanded on August 1, 2017, leaving McFarland the sole managing executive of Magnises and endowing him with sole and binding signing authority to conduct business on behalf of Magnises.

12. **Grant Margolin**, age 25, resides in Roslyn, New York. From approximately December 2014 to November 2016, Margolin was the Vice President of Marketing and Branding for Magnises. From approximately February 2016 until May 2017, Margolin was Fyre Media's CMO. Margolin has never been registered with the Commission in any capacity, nor associated with any registered entity.

13. **Daniel Simon**, age 23, resides in Weehawken, New Jersey. Simon attended high school with McFarland. Beginning in 2014 and continuing through April 2017, Simon intermittently served as a contractor for each of McFarland's businesses, Magnises, Fyre Media, and Fyre Festival. Simon has never been registered with the Commission in any capacity, nor

5

associated with any registered entity.

## OTHER RELEVANT ENTITIES

14.     **Fyre Festival, LLC** is a Delaware limited liability corporation and subsidiary of
Fyre Media with its principal place of business in New York, New York.  McFarland founded
Fyre Festival in late 2016.  Fyre Festival was purportedly in the business of promoting and
producing a live music festival to take place over two weekends in the Bahamas in early 2017.
On July 7, 2017, three named petitioners filed an involuntary petition for bankruptcy against
Fyre Festival in the United States Bankruptcy Court for the Southern District of New York, Case
No. 17-11883(MG).  Fyre Festival has never been registered with the Commission in any
capacity, and Fyre Festival has never registered any securities offering with the Commission.

## THE FYRE MEDIA AND FYRE FESTIVAL FRAUD

### *Background*

15.     In early 2016, McFarland founded Fyre Media, which was formed to develop an
online, digital platform—called "fyreapp.com"—that would enable buyers to directly book
musicians, celebrities, and other talent for live performances.

16.     Later in 2016, McFarland established Fyre Festival, which was intended to launch
a live music festival in the Bahamas in April and May 2017.

17.     McFarland acted as the primary solicitor of investment in Fyre Media's
unregistered equity and convertible promissory note offerings, as well as of investment in Fyre
Festival via investment contracts, which gave investors the rights to profits in the festival's
commercial enterprises.

18.     In 2016 and 2017, McFarland raised approximately $7.9 million from at least 43
investors in the Fyre Media offerings and approximately $16.5 million from at least 59 investors
in the Fyre Festival offerings.

6

19.     In offering documents and other communications with Fyre Media and Fyre

Festival investors, McFarland and Fyre Media:

- Made false statements concerning key Fyre Media and Fyre Festival financial metrics and assets;

- Falsified financial data;

- Made false claims of affiliations with talent;

- Created a fraudulent brokerage statement in order to suggest to investors and banks that McFarland personally possessed collateral sufficient to securitize investments;

- Made false statements and created a fake document concerning purported bank loans and a purported significant pending investment in Fyre Media;

- Claimed, falsely, that he would obtain event cancellation insurance for Fyre Festival; and

- Engaged in a scheme to create the illusion that Magnises was being acquired by a third party that did not exist.

### *McFarland and Fyre Media's False Statements Concerning Financial Metrics, Assets, and Talent Bookings*

20.     In solicitations and documents he furnished to investors and prospective investors,

McFarland made numerous false and misleading statements about the success of Fyre Media's

online booking platform—"fyreapp.com"—preparations for Fyre Festival, and the number of

talent bookings.

21.     These documents—which induced investors to invest over $24 million in Fyre

Media and Fyre Festival—included private placement memoranda, PowerPoint updates to

existing investors, income statements, and emails, all of which materially exaggerated the

number of talent bookings made via fyreapp.com, the revenue and income derived from these

bookings, and the Fyre companies' assets.

### The September 2016 Offer Reports

22.     In September 2016, McFarland created fraudulent Fyre Media spreadsheets

purporting to show offers made and accepted through Fyre Media.

23.     These "offer reports" were designed to, and did, exaggerate the success of the

Fyre Media platform.

24.     Over the course of one night in September 2016, McFarland instructed Margolin,

Fyre Media's CMO, as to how to create the false offer reports, as follows:

- McFarland sent Margolin an offer report that showed 15 "accepted" Fyre Media offers totaling $5.4 million, an average of $360,000 per offer. This offer report included million dollar purported "accepted" offers from A-list artists such as Jennifer Lopez ($1.75 million), the Foo Fighters ($1.5 million), and Selena Gomez ($1 million);

- Fyre Media's CTO sent Margolin an offer report generated directly from the fyreapp.com booking platform, which, by contrast, showed 33 "accepted" Fyre Media offers totaling just $275,800, on average, less than $8,400 per offer;

- As directed by McFarland, Margolin combined the two reports to create a new purported accepted offer report, which showed 42 "accepted" Fyre Media offers totaling $5.6 million.

25.     Shortly after receiving the combined offer report and without making any

changes, McFarland emailed the combined offer report to a potential investor. The investor

subsequently made an equity investment in Fyre Media.

<u>The December 2016 PowerPoint</u>

26.     In December 2016, McFarland created a PowerPoint presentation to update

existing investors on Fyre Media's financial and operational performance. This investor

presentation stated that Fyre Media was "on track to achieve **$160M** [in] completed bookings by

Q4 2017." (Emphasis added).

27.     Shortly after receiving a copy of the PowerPoint presentation, Fyre Media's Chief

Revenue Officer ("CRO") sent an email to Margolin asking for the basis of the $160 million

projection, which was inconsistent with the CRO's understanding of the correct figure. The

CRO characterized the figure as "aggressive," and asked whether it was a typo.  Margolin replied
that this was a "typo," and later agreed with the CRO that such a lofty projection would be
inappropriately "aggressive."

28.     Nevertheless, just days later, McFarland edited a "Fyre Business Update" email
initially drafted by the CRO.  The revised investor correspondence tripled the stated goal for
completed bookings—from $50 million to $150 million—and increased the number of "talent
represented" from 200 to 1,200.  McFarland later sent the revised correspondence, including the
inflated figures, to investors, who relied on the inflated metrics in making further investments in
Fyre Media.

### The January 2017 Private Placement Memorandum

29.     In January 2017, McFarland created a Private Placement Memorandum ("PPM")
concerning Fyre Media and Fyre Festival, which was widely distributed to existing and
prospective investors in early 2017.

30.     The PPM stated that "[s]ince launching in May 2016, **thousands** of offers
representing **tens of millions of dollars** of performance and appearances have been made and
accepted with Fyre."  (Emphasis added).

31.     The statements regarding the total number of offers and their value were false.
Between May 2016 and April 2017, only **60** bookings for performance and appearances were, in
fact, confirmed and paid.  The total fees paid to Fyre Media as a result of these 60 bookings
totaled only **$57,443**.

32.     The PPM (as well as numerous other investor communications) also falsely stated
that Fyre Media had acquired a parcel of real estate in the Bahamas worth approximately $8
million, to be used as the site of the Fyre Festival.  Certain investors relied on this purported

acquisition in making their investment decisions.  In fact, Fyre Media never acquired any real estate in the Bahamas.

33.     By engaging in the conduct described above, Margolin negligently assisted McFarland with the creation of the September 2016 Offer Reports, the December 2016 PowerPoint presentation, and the January 2017 PPM.  Margolin acted at least negligently by unreasonably assisting McFarland in creating false or misleading statements concerning Fyre Media and Fyre Festival's financial metrics, offers, and bookings, which McFarland provided to investors.  By failing to raise questions about the documents he drafted and revised, Margolin's conduct was sloppy and ill-calculated, and he did not employ the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise under the circumstances.

The February and April 2017 Offer Reports

34.     Between February and April 2017, McFarland created additional false offer reports for Fyre Media, which were used to induce investors to invest money in Fyre Media.

35.     On February 2, 2017, McFarland provided a contractor for each of McFarland's three businesses, Simon, with an offer report generated by Fyre Media's CTO directly from the fyreapp.com booking platform.

36.     Shortly thereafter, McFarland provided Simon with detailed instructions concerning how to manipulate the data contained in the offer report, including to:

- "Make sure 35% [of the locations are] international cities;"

- "[S]prinkle in a couple of higher offer amounts;" and

- "[S]how $30.1 mm total bookings in January with strong repeat buyer percentages."

37.     As instructed by McFarland, Simon then created a new offer report, in which he

fabricated offers for talent (with whom Fyre Festival, in fact, had no relationship) purportedly submitted by offeror accounts (which, in fact, did not exist) for performances at arbitrarily selected venues.

38.     Although the original offer report generated from the fyreapp.com booking platform included just $1.459 million in total offers for the month of January 2017, the new, fabricated, offer report included $34.79 million in purported total offers for the same time period.

39.     In April 2017, McFarland created a second fraudulent offer report.  McFarland again started with a report generated from the fyreapp.com booking platform and asked Simon to inflate the numbers generated from fyreapp.com.

40.     In response to a question from Simon as to whether he should "continue the trend" for offers in this new offer report, McFarland replied "yes let's increase them."

41.     Between February and April 2017, McFarland sent the offer reports to numerous existing and potential investors.  Using these false offer reports, among other documents, McFarland repeatedly made false statements to investors and prospective investors about the volume of offers received by talent through Fyre Media's booking platform.

42.     By engaging in the conduct described above, Simon negligently assisted McFarland with the creation of the February and April 2017 Offer Reports.  Simon acted at least negligently in creating the offer reports by failing to inquire as to the source of the information contained in those reports, personally altering and making up certain of the metrics, and not following up on inconsistencies in the documents and information provided to him by McFarland.  Simon's conduct was sloppy and ill-calculated, and he did not employ the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise under the circumstances.

43.     McFarland paid Simon thousands of dollars from McFarland's personal bank account for the short-term contract work, which consisted entirely of creating the false spreadsheets.

### *McFarland and Fyre Media's False Statements Concerning a Fake Brokerage Statement, McFarland's Net Worth, Loans, and Investments*

44.     In response to requests from at least three existing and prospective Fyre Festival investors that their investments be collateralized, McFarland created a fake brokerage statement, which showed that McFarland owned $2.56 million in shares in the common stock of Facebook, Inc. ("Facebook").  In fact, McFarland owned just $1,499 worth of Facebook shares, a tiny fraction of the shares indicated by the fake brokerage statement.

45.     McFarland attached the fake brokerage statement to at least three executed investor agreements and made numerous misstatements concerning his fictitious shares of Facebook in emails and texts to other prospective investors.

46.     In early 2017, in an effort to keep the struggling Fyre Festival afloat, McFarland sought millions of dollars in personal loans from two well-established banks.  To attempt to induce the banks to grant him loans, McFarland provided false information in his loan applications, including representations inflating his net worth and reiterating the false claim that he owned $2.56 million worth of Facebook stock.

47.     McFarland also provided one of the banks with a copy of the fake brokerage statement, as well as a fraudulent Fyre Media income statement, which grossly inflated the company's revenue and income.

48.     Although both of McFarland's loan applications ultimately were denied, he repeatedly told potential investors that the loans had been approved and that monies from these loans could serve as collateral for their investments.

49.     McFarland emailed one investor a screen shot of a fake email purportedly from a

loan officer at one of the banks, which stated that McFarland had been approved for a $3 million loan and that disbursement of the loan was pending.  The loan officer never drafted such an email.

50.     McFarland also repeatedly told investors that a venture capital firm had completed its due diligence process and decided to invest more than $10 million in Fyre Media. In fact, at the time McFarland made these false statements to investors, the venture capital firm already had told him that it would not invest in Fyre Media due to McFarland's failure to provide requested documents.

### McFarland and Fyre Media's False Statements
### Concerning Insurance and Agreements with Talent

51.     As an inducement to invest in Fyre Festival, McFarland also falsely communicated to actual and prospective investors that they would have the rights to payouts from Fyre Festival event cancellation policies if the festival did not proceed as planned.  In reality, however, McFarland never executed any event cancellation policies for the festival. When the festival was canceled, these investors lost their investments in full.

52.     McFarland's false statements confirming the purported existence of these policies were material to the decision of at least one investor to invest in Fyre Festival.

53.     In investor presentations and emails that McFarland provided to prospective investors concerning Fyre Media and Fyre Festival, McFarland also falsely stated that at least ten well-known artists had "exclusive contracts" with Fyre Media; *i.e.*, that all of their future bookings would be made through fyreapp.com.  No such contracts, in fact, were ever in place.

54.     McFarland also falsely told investors that a number of stars—including Justin Bieber and Drake—would perform at the Fyre Festival, when, in fact, no such agreements were ever reached.  McFarland persisted in these false representations regarding artists, despite

13

requests to desist by the artists' agents.

### *McFarland and Fyre Media Engaged in a Scheme to Create the Illusion that Magnises was the Subject of an Imminent Acquisition*

55.     Between December 2016 and May 2017, McFarland made numerous false statements and created fake documents to create the illusion that Magnises would be (and then was) purchased by a third party buyer for between $35 and 40 million.  This scheme was undertaken in order to create the false impression for investors and potential investors that McFarland was a successful entrepreneur with a proven track record of success.

56.     In at least one instance, McFarland used the fictitious acquisition to solicit investment in the Fyre entities using the purported "post-sale" value of Magnises as collateral.

57.     As part of this scheme, McFarland concocted an ever-changing cast of purported Magnises buyers.  First, the purported buyers were an unnamed consortium of five companies (including Magnises and Fyre).  Next, the purported buyers were a group led by a well-known fashion mogul.  Then, the purported buyer was a Connecticut-based broker-dealer.

58.     Indeed, as recently as April 2017, McFarland appeared to still be changing the identity of the buyers, with McFarland proposing in an email to a colleague that the buyers could be a mixed group of celebrities (such as Jay-Z and Sean "P. Diddy" Combs) and Fyre Media investors.

59.     McFarland invented a name for the purported buyers—"Saddleback Media"—and listed Magnises's New York City address as Saddleback Media's purported address.  In other words, McFarland falsely claimed that Magnises's purported independent buyer was headquartered at the **same** location as Magnises.

60.     To imbue this scheme with a gloss of legitimacy, McFarland engaged two large and reputable law firms to prepare transactional documents to unwittingly "paper" the fictitious

deal.

61.     McFarland also created a fake employment retainer agreement between himself and Saddleback Media.  This agreement bears the electronic signature of Saddleback's purported President, a certain "G. Smythe," an individual who—on information and belief—does not exist.

## THE MAGNISES FRAUD

62.     In 2013, McFarland founded Magnises, which he promoted as an exclusive club for millennials, providing its members with priority access to concerts, sporting events, restaurants, and social events, and the use of a "Magnises Card"—a black metal credit card linked to the user's own credit card.  Magnises derived revenues primarily from periodic membership dues.

63.     McFarland was the primary solicitor of investment in the unregistered equity and convertible promissory note offerings of Magnises.

64.     Between 2013 and 2016, McFarland and Magnises made material misrepresentations and omissions in the offer and sale of securities in Magnises and in connection with the purchase or sale of Magnises securities.  This misconduct related primarily to the following areas: (i) false statements concerning key financial metrics; and (ii) false statements concerning how Magnises operated its business.

65.     McFarland and Magnises succeeded in raising approximately $3 million from at least 24 investors.

### *McFarland and Magnises's False Statements Concerning Key Financial Metrics*

66.     McFarland made false statements to existing and potential Magnises investors through PowerPoint presentation investor updates, income statements, and other documents concerning Magnises's revenues and membership numbers.

67.     All of these documents misrepresented that Magnises had between 7,000 and

40,000 members and that, between March 2014 and August 2015, it had $2.5 million in revenue.

68.     According to former Magnises employees, however, Magnises never had more than 4,000 to 5,000 members, and had peak monthly revenues in the range of $100,000 per month.

69.     Certain Magnises investors relied on the inflated numbers provided to them by McFarland, and would not have made subsequent investments in Magnises if they had known the truth.

### McFarland and Magnises's False Statements Concerning Magnises's Operations

70.     In soliciting investments in Magnises, McFarland also communicated to investors that Magnises had strategic partnerships with certain entertainment and hospitality providers, purportedly enabling Magnises's concierge service to obtain tickets for Magnises members at reduced rates.

71.     In truth, such strategic partnerships did not exist, and Magnises employees and contractors repeatedly purchased tickets for Magnises members at McFarland's behest from public websites.  Where tickets were unavailable from public websites, however, McFarland nonetheless would promise tickets to Magnises members, only to be unable to provide them.

72.     Magnises's purported strategic partnerships with entertainment and hospitality providers were a key aspect of the Magnises business model, according to certain Magnises investors, and formed part of the basis on which they invested.

### McFARLAND AND FYRE MEDIA'S OFFERING OF FYRE MEDIA AND FYRE FESTIVAL SECURITIES IN UNREGISTERED TRANSACTIONS

73.     McFarland founded, owned, operated, and exercised close control over both Fyre Media and Fyre Festival.

74.     Fyre Festival was created for the primary purpose of providing publicity for the

Fyre Media online booking platform (fyreapp.com), and the Fyre Media private placement memoranda provided detailed information on Fyre Festival.

75.     Between mid-2016 and April 2017, McFarland and Fyre Media offered to sell and sold the shares of stock and convertible promissory notes when no registration statement was on file with the Commission and the shares of stock and convertible promissory notes were not exempt from the registration requirements of the Securities Act.

76.     The shares of stock and convertible promissory notes McFarland and Fyre Media offered to sell and sold to Fyre Media and Fyre Festival investors are securities within the meaning of the Securities Act.  McFarland executed the convertible promissory notes.

77.     In connection with these sales or offers to sell, McFarland and Fyre Media made use of the means and instruments of transportation or communication in interstate commerce or of the mails, including the use of the internet, interstate phone calls, and the United States mail.

78.     In connection with these sales or offers to sell, McFarland and Fyre Media carried or caused to be carried through the mails or in interstate commerce, by the means or instruments of transportation, securities for the purpose of sale or for delivery after sale when no registration statement was filed or in effect as to the securities.

79.     During the period from 2016 through May 2017, McFarland and Fyre Media continuously offered and sold shares of stock and convertible promissory notes.

80.     McFarland and Fyre Media offered and sold shares of stock and convertible promissory notes in multiple states, and the offering exceeded $24.4 million.

81.     The shares of stock and convertible promissory notes were sold to many unaccredited investors.

82.     Many of the investors in the shares of stock and convertible promissory notes

were financially unsophisticated and did not have access to the kind of information that would have been available in a registration statement.

83.     McFarland and Fyre Media did not distribute audited financial statements to investors before the sale of the shares of stock and convertible promissory notes.

84.     McFarland and Fyre Media raised approximately $7.9 million from at least 43 Fyre Media investors.

85.     McFarland raised approximately $16.5 million from at least 59 Fyre Festival investors.

## McFARLAND ACTED AS AN UNREGISTERED BROKER-DEALER

86.     Between 2016 and 2017, McFarland raised approximately $24.4 million from at least 102 investors in Fyre Media and Fyre Festival offerings.

87.     McFarland oversaw and controlled everything that went into investor solicitation materials, and personally and directly solicited potential investors either in-person, by phone, by email, or text message.

88.     McFarland advised prospective Fyre Media and Fyre Festival investors on the merits of an investment by constantly promoting the purported rapid expansion and mass appeal of the fyreapp.com online booking platform and the size and purported participation of mega-stars in Fyre Festival.

89.     McFarland also exercised control over the investor funds received, as the signatory of the Fyre Media bank accounts that he opened and into which investor funds were deposited.

90.     McFarland engaged in the business of effecting transactions in securities for the accounts of others without registering as a broker-dealer and without qualifying for any

exemption.

## CLAIMS FOR RELIEF

### *First Claim for Relief*

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) Thereunder
(Against McFarland, Fyre Media, and Magnises**)

91.     As to McFarland and Fyre Media the Commission realleges and reincorporates

paragraphs 1 through 10, 14 through 61 as if fully set forth herein.

92.     As to McFarland and Magnises, the Commission realleges and reincorporates

paragraphs 1 through 9, 11, 62 through 72 as if fully set forth herein.

93.     From at least 2013 through 2017, as a result of the conduct alleged in this

Complaint, McFarland, Fyre Media, and Magnises knowingly, or with severe recklessness, in

connection with the purchase or sale of securities, directly or indirectly, by use of the means or

instrumentalities of interstate commerce or of the mails, or of a facility of a national securities

exchange:

a.  employed devices, schemes, or artifices to defraud;

b.  made untrue statements of material fact, omitted to state material facts necessary in

order to make the statements made, in the light of the circumstances under which they

were made, not misleading; and

c.  engaged in acts, practices, or courses of business which operated or would operate as

a fraud or deceit upon any person.

94.     By engaging in the foregoing conduct, McFarland, Fyre Media, and Magnises

violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section

10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) thereunder.

### *Second Claim for Relief*

### Violations of Sections 17(a)(1), (2), and (3) of the Securities Act
### (Against McFarland, Fyre Media, and Magnises)

95.     As to McFarland and Fyre Media the Commission realleges and reincorporates paragraphs 1 through 10, 14 through 61 as if fully set forth herein.

96.     As to McFarland and Magnises, the Commission realleges and reincorporates paragraphs 1 through 9, 11, 62 through 72 as if fully set forth herein.

97.     From at least 2013 through 2017, as a result of the conduct alleged in this Complaint, McFarland, Fyre Media, and Magnises, in the offer or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails:

    a.  Employed devices, schemes, or artifices to defraud;

    b.  Obtained money or property by means of any untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.  Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

98.     With respect to violations of Section 17(a)(1) of the Securities Act, McFarland, Fyre Media, and Magnises acted knowingly or recklessly.  With respect to violations of Sections 17(a)(2) and (3) of the Securities Act, McFarland, Fyre Media, and Magnises acted at least negligently.

99.     By engaging in the foregoing conduct, McFarland, Fyre Media, and Magnises violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 17(a)(1), (2), and (3) of the Securities Act.

### *Third Claim for Relief*

### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against McFarland and Fyre Media)

100.    As against McFarland and Fyre Media, the Commission repeats and realleges paragraphs 1 through 10, 14, 73 through 85 of this Complaint as if fully set forth herein.

101.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions issued by Fyre Media and Fyre Festival described in this Complaint, and no exemption from registration—including the Rule 3a4-1 safe harbor—applies with respect to these securities and transactions.

102.    From 2016 through May 2017, Fyre Media, its officers, directors, employees, subsidiaries, and/or affiliates, and McFarland, directly or indirectly:

   a.  made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements or otherwise, securities as to which no registration statement was in effect; and/or

   b.  made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise, as described herein, without a registration statement having been filed or being in effect with the Commission as to such securities.

103.    McFarland and Fyre Media directly or indirectly offered or sold securities in unregistered nonexempt transactions in interstate commerce.

104.    By reason of the foregoing, McFarland and Fyre Media violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act.

### Fourth Claim for Relief

### Violation of Section 15(a) of the Exchange Act
### (Against McFarland)

105.    As to McFarland, the Commission realleges and reincorporates paragraphs 1 through 10, 14, and 86 through 90 as if fully set forth herein.

106.    McFarland is not registered with the Commission in any capacity, and has not been registered with the Commission in any capacity at any time.

107.    Between 2016 and 2017, McFarland made use of the mails or any means or instrumentalities of interstate commerce to effect transactions in and induce or attempt to induce the purchase or sale of shares of stock and convertible promissory notes in Fyre Media, Fyre Festival, and Magnises.

108.    The shares of stock and convertible promissory notes that McFarland sold and attempted to sell were not exempted securities.

109.    By engaging in the conduct described herein, McFarland, while engaged in the business of effecting transactions in securities for the accounts of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered with the Commission as a broker or dealer or as an associated person of a registered broker or dealer, in accordance with Section 15(a) of the Exchange Act.

110.    By engaging in this conduct, McFarland has violated, and unless enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### Fifth Claim for Relief

### Violations of Section 17(a)(3) of the Securities Act
### (Against Margolin and Simon)

111.    As to Margolin, the Commission realleges and incorporates paragraphs 1 through

8, 12, and 15 through 33 as if fully set forth herein.

112.    As to Simon, the Commission realleges and reincorporates paragraphs 1 through 8, 13, 15 through 19, and 34 through 43 as if fully set forth herein.

113.    Margolin and Simon directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, and at least negligently, engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers.

114.    By reason of the foregoing, Margolin and Simon directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

A.    Finding that McFarland, Fyre Media, and Magnises violated Sections 17(a)(1), (2), and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) thereunder and permanently restraining and enjoining McFarland, Fyre Media, and Magnises and all persons in active concert or participation with them from violating the foregoing statutes and rules;

B.    Finding that McFarland and Fyre Media violated Sections 5(a) and 5(c) of the Securities Act and permanently restraining and enjoining McFarland and Fyre Media and all persons in active concert or participation with them from violating the foregoing statutes;

C.    Finding that McFarland is liable for violating Section 15(a) of the Exchange Act and permanently restraining and enjoining McFarland and all persons in active concert or participation

with him from violating the foregoing statute;

        D.     Permanently restraining and enjoining McFarland—directly or indirectly, including, but not limited to, through any entity he owns or controls—from participating in the issuance, offer, or sale of any security;

        E.     Finding that Margolin and Simon are liable for violating Section 17(a)(3) of the Securities Act and permanently restraining and enjoining Margolin and Simon and all persons in active concert or participation with them from violating the foregoing statute;

        F.     Ordering McFarland, Fyre Media, and Magnises to disgorge all ill-gotten gains obtained and illegal losses avoided as a result of the acts or courses of conduct alleged in this Complaint, plus prejudgment interest;

        G.     Ordering Simon to disgorge all ill-gotten gains obtained and illegal losses avoided as a result of the acts or courses of conduct alleged in this Complaint, plus prejudgment interest;

        H.     Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d);

        I.     Permanently barring McFarland from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

        J.     Barring Margolin, pursuant to the Court's equitable authority under Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15

U.S.C. § 78o(d)] pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] for a period of seven (7) years;

      K.      Barring Simon, pursuant to the Court's equitable authority under Section 21(d)(5)

of the Exchange Act [15 U.S.C. § 78u(d)(5)], from acting as an officer or director of any issuer

that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. §

78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. §

78o(d)] pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2)

of the Exchange Act [15 U.S.C. § 78u(d)(2)] for a period of three (3) years;

      L.      Retaining jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may hereby be entered, or to entertain any suitable application or motion

by the Commission for additional relief within the jurisdiction of this Court.

      M.      Granting such other and further relief as the Court deems just and appropriate or

necessary for the benefit of investors.

## JURY DEMAND

      Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by

jury in this action on all the issues so triable.

Dated:  July 24, 2018                Respectfully submitted,

                                     By:                       

                                        Sarah Heaton Concannon
                                        (SDNY Bar Code #SC9111)
                                        U.S. Securities and Exchange Commission

Of Counsel:                        100 F Street, N.E.
                                        Washington, D.C. 20549

James J. Bresnicky               Telephone:  (202) 551-5361
Sarah R. Lamoree                Facsimile:  (202) 772-9282
Benjamin D. Brutlag              Email:  ConcannonS@sec.gov