**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re FYRE FESTIVAL LITIGATION                    1:17-CV-03296 (PKC)

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT JEFFREY ATKINS'
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT**

**GERAGOS & GERAGOS, APC**
LORI G. FELDMAN (LF-3478)

7 West 24th Street
New York, New York 10010
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
lori@geragos.com

*Lead counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION.............................................................................................................10

ARGUMENT…………….........................................................................................................10

I.     STANDARD OF REVIEW.................................................... ............................17

II.    DEFENDANT'S "WELL-SETTLED DOCTRINES OF
     NEW YORK LAW" DO NOT APPLY.........................................................................18

        A.     Plaintiffs Do Not Assert A Breach of Contract Claim Against
              Atkins, And Even If They Did, Their Tort Claims Would Still Be
              Allowed...............................................................................................18

        B.     Atkins Had A Duty to Plaintiffs Independent
              of The Contract.......................................................... ............................20

        C.     Atkins' Statements Do Not Qualify As Puffery................................................24

III.    PLAINTIFFS PROPERLY STATE COMMON-LAW CLAIMS..............................27

        A.     Plaintiffs State A Case For Fraud………...............................................27

              1.     Plaintiffs' Allegations Meet The Heightened Pleading
                     Standards of 9(b)............................................................ .......................27

              2.     The SAC Shows Atkins Intended to Defraud Plaintiffs.....................31

              3.     Plaintiffs Reasonably Relied Upon Atkins' Statements.....................32

        B.     Plaintiffs Stated a Case For Negligent Misrepresentation...............................35

              1.     The SAC is Sufficiently Particular........................................................35

               2.     The SAC Sufficiently Alleges a Special Relationship,
                     and Plaintiffs Reasonably Relied Upon His Statements.....................35

        C.     Plaintiffs Stated a Case For Negligent Misrepresentation..............................35

        D.     Plaintiffs Stated a Case For Tortious Interference
               With Contract......................................................................................38

        E.     Plaintiffs State A Case For Unjust Enrichment.............................................40

IV.    PLAINTIFFS PROPERLY ASSERT STATUTORY CLAIMS..............................42

      A.    Plaintiffs State A Claim Under California's
              False Advertising Law......................................................................43

      B.    Plaintiffs State A Claim Under Colorado's Consumer
              Protection Act..................................................................................43

      C.    Plaintiffs State A Claim Under The Illinois Consumer Fraud
              Act and Uniform Deceptive Trade Practices Act...........................45

      D.    Plaintiffs State A Claim Under The New York
              General Business Law.....................................................................47

V.    CONCLUSION…………...............................................................................48

# TABLE OF AUTHORITIES

## CASES

*Bell Atlantic Corp. v. Twombly,*
   127 S.Ct. 1955 (2007)............................................ ....................................... ............12

*McDowell v. N. Shore-Long Island Jewish Health Sys., Inc.,*
   839 F. Supp. 2d 562 (E.D.N.Y. 2012)............................................................12

*Todd v. Exxon Corp.,*
   (2010) 725 F. Supp. 2d 1151 ........................................................................12

*Lord Electric Co. v. Barber Asphalt Paving Co.,*
   226 N.Y. 427, 432 (Ct. App. 1919)................................................................13

*Morse/Diesel Inc. v. Trinity Industries, Inc.,*
   655 F. Supp. 346 (S.D.N.Y. 1987)................................................................13

*Price Brothers Co. v. Olin Construction Co., Inc.,*
   528 F. Supp. 716 (W.D.N.Y. 1981)............................................... ..................13

*Kwan v. Schlein,*
   246 F.R.D. 447 (S.D.N.Y. 2007)...................................................................14

*Uitz v. Lustogman Firm, P.C.,*
   No. 13 CIV. 6040 RMB, 2014 WL 3767056 (S.D.N.Y. July 28, 2014)......................14

*Physicians Mut. Ins. Co. v. Greystone Servicing Corp.,*
No. 07 CIV 10490 (NRB), 2009 WL 855648 (S.D.N.Y. Mar. 25, 2009).................................14

*Kallman v. Pinecrest Modular Homes, Inc.,*
   916 N.Y.S. 2d 221 (N.Y. App. Div. 2011)....................................................15

*Brass v. American Film Techs., Inc.,*
   987 F.2d 142 (2d Cir. 1993)........................................................................15

*Sofi Classic S.A. de C.V. v. Hurowitz,*
   444 F. Supp.2d 231 (S.D.N.Y. 2006)..........................................................15

*Clark -Fitzpatrick, Inc. v Long Is. R.R. Co.,*
   70 N.Y.2d 382, 389 (1987).........................................................................15

*Bullmore v. Banc of America Securities LLC,*
   485 F. Supp. 2d 464 (S.D.N.Y. 2007)..........................................................15

*Accusystems, Inc. v. Honeywell Info. Sys., Inc.,*
    580 F. Supp. 474 (S.D.N.Y. 1984)............................................................................17

*Moses v. Martin,*
    360 F. Supp. 2d 533 (2004)....................................................................................17

*Sears, Roebuck & Co. v. Enco Associates, Inc.,*
    604 F.2d 737 (1977)................................................................................................18

*Deerfield Comm. Corp. v. Chesebrough–Ponds, Inc.,*
    68 N.Y.2d 954 (1986).............................................................................................18

*EED Holdings v. Palmer Johnson Acquisition Corp.,*
    387 F. Supp. 2d 265 (S.D.N.Y. 2004)....................................................................19

*Cohen v. Koenig,*
    25 F.3d 1168 (2d Cir.1994)....................................................................................19

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187, 206 (2d Cir. 2009)...........................................................................20

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,*
    75 F.3d 801 (2d Cir. 1996).....................................................................................20

*In re Virtus Investment Partners, Inc. Securities Litigation,*
    195 F. Supp. 3d 528, 537-38 (S.D.N.Y. 2016)......................................................20

*Bd. Of Managers of 250 Bowery Condo. v. 250 VE LLC,*
    2018 NY Slip Op 31168(U), *8 (N.Y. Sup. Ct. 2016).............................................22

*DeVaney v. Chester,*
    709 F. Supp. 1255 (S.D.N.Y. 1989).......................................................................23

*Luce v. Edelstein,*
    802 F.2d 49 (2d Cir.1986).....................................................................................23

*M & T Mortg. Corp. v. White,*
    736 F. Supp. 2d 538 (E.D. N.Y. 2010)..................................................................23

*Watts v. Jackson Hewitt Tax Service Inc.,,.*
    579 F. Supp. 2d 334 (E.D. N.Y. 2008)..................................................................23

*Luce v. Edelstein,*
    802 F.2d 49 (2d Cir.1986).....................................................................................25

*Banque Arabe et Internationale D'Investissement v. Maryland National Bank,*
    57 F.3d 146 (2d Cir. 1995)........................................................................................25

*Nat'l Union Fire Ins. Co. v. Red Apple Group, Inc.,*
    273 A.D.2d 140 (1st Dep't 2000)..............................................................................26

*Woods v. Maytag Co.,*
    807 F. Supp. 2d 112 (E.D.N.Y. 2011).......................................................................26

*In re Mercator Software, Inc. Securities Litigation,*
    161 F. Supp. 2d 143 (D. Conn. 2001)........................................................................26

*Campbell v. Freshbev LLC,*
    1:16–cv–7119(FB)(ST), 2018 WL 3235768 (E.D.N.Y. 2018)..................................26

*Pryor v United States Steel Corp,.*
    591 F. Supp. 942 (S.D.N.Y. 1984)............................................................................26

*JP Morgan Chase Bank v. Winnick,*
    350 F. Supp. 2d 393 (S.D.N.Y. 2004).......................................................................28

*Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophides,*
    106 F.3d 22 (2d Cir. 1997)........................................................................................28

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009)......................................................................................28

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,*
    75 F.3d 801 (2d Cir. 1996)........................................................................................28

*In re Time Warner,*
    9 F.3d at 259, 267 (2d Cir. 1993)..............................................................................28

*Breitkopf v. Gentile,*
    41 F. Supp. 3d 220 (E.D. N.Y. 2014)........................................................................31

*In re September 11 Litig.,*
    280 F. Supp. 2d 279 (S.D.N.Y. 2003).......................................................................31

*American Telephone and Telegraph Co. v. The City of New York et al.,*
    83 F.3d 549 (2d Cir.1996)..........................................................................................31

*Curley v. AMR Corp., et al.,*
    153 F.3d 5 (2d Cir.1998)............................................................................................31

*Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet,*
    414 F. Supp. 153 (S.D.N.Y. 1975)................................................................31

*Countrywide Publications, Inc. v. Kable News Co.,*
    74 A.D.2d 522 (1980)...........................................................................34

*Buckley v. 112 Central Park South,*
    285 App.Div. 331 (1954)........................................................................34

*Vassardakis v. Parish,*
    36 F. Supp. 1002 (D.C.N.Y. 1941).............................................................34

*Navarro v. Fiorita,*
    271 App. Div. 62 (1946).........................................................................34

*Rendich v. Preferred Mut. Fire Ins. Co.,*
    274 App. Div. 800 (1948)......................................................................34

*Buckley v. 112 Central Park South, Inc.,*
    285 App. Div. 331 (1954).......................................................................34

*Recovery Racing, LLC v. Sunrise Motors, LLC,*
    No. 12834–04, 2005 WL 3193701 (Sup. Ct. Nassau Cty. 2005)...............................34

*Greyhound Corp. v. Commercial Cas. Ins. Co.,*
    259 A.D. 317 (1940)............................................................................34

*Mathias v. Jacobs,*
    238 F. Supp. 2d 556 (S.D.N.Y. 2002).........................................................35

*Matarese v. Moore–McCormack Lines,*
    158 F.2d 631 (2d Cir. 1946)....................................................................35

*Seifts v. Consumer Health Solutions LLC,*
    61 F. Supp. 3d 306 (S.D.N.Y. 2014)..........................................................36

*Georgetown Co., LLC v. IAC/Interactive Corp.,*
    2018 NY Slip Op. 32078(U), 2018 WL 4048051 (N.Y. C.C.D 2018).......................36

*Laster v. T-Mobile USA, Inc.,*
    407 F. Supp. 2d 1181 (S.D. Cal. 2005)........................................................37

*Leoni v. State Bar,*
    39 Cal.3d 609 (1985).............................................................................39

*Rhino Linings, USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,*
   62 P.3d 142 (2003)..................................................................................................39

*Campfield v. State Farm Mut. Auto. Ins. Co.,*
   532 F.3d 1111 (10th Cir. 2008)..............................................................................39

*Hall v. Walter,*
   969 P.2d 224 (1998)................................................................................................39

*Siegel v. Levy Organization Development Co.,*
   153 Ill.2d 534 (1992)..............................................................................................41

*Griffin v. Universal Casualty Co.,*
   274 Ill. App. 3d 1056 (1995)...................................................................................41

*Falcon Associates, Inc. v. Cox,*
   298 Ill. App. 3d 652 (5th Dist. 1998)......................................................................41

*Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine,*
   392 Ill. App. 3d 1 (2009).........................................................................................41

*Smith v. Prime Cable of Chi.,*
   276 Ill.App.3d 843 (1st Dist. 1995).........................................................................41

*Tarin v. Pellonari,*
   253 Ill. App. 3d 542 (1993).....................................................................................43

*Elacqua v. Physicians' Reciprocal Insurers,*
   860 N.Y.S.2d 229 (2008).........................................................................................43

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,*
   85 N.Y.2d 20 (1995)................................................................................................43

*Gaidon v. Guardian Life Ins. Co. of Am.,*
   94 N.Y.2d 330 (1999)..............................................................................................43

*Small v. Lorillard Tobacco Co., Inc.,*
   94 N.Y.2d 43 (1998)................................................................................................43

*Kaufman v. Sirius XM Radio, Inc.,*
   751 F. Supp. 2d 681 (S.D.N.Y. 2010)......................................................................43

*Smith v. Prime Cable of Chi.,*
   276 Ill.App.3d 843 (1st Dist. 1995).........................................................................41

RULES

Fed. R. Civ. Proc. 8.................................................................................................................14

Cal. Bus. & Prof. § 17500....................................................................................................35

Co. St. § 6-1-105...................................................................................................................43

N.Y. Gen. Bus. § 349............................................................................................................47

## INTRODUCTION

Defendant Jeffrey Atkins (also known as "Ja Rule") controls Fyre Festival and the corporate entities Fyre Media and Fyre Festival, LLC. (SAC ¶ 33)[1]. He is also founder, significant shareholder, director and officer of Fyre Media and its subsidiary Fyre Festival LLC, who are the entities responsible for the marketing of the Fyre Festival, and tickets and merchandise relating to the Fyre Festival. Atkins' name is synonymous with Fyre Festival, which he marketed as "the cultural experience of the decade." (SAC ¶ 33, 61). However, when guests arrived at this "luxury event," it was nothing more than a dangerous debacle on a remote island with no infrastructure or basic necessities, and was thereafter branded "firefraud" by thousands of outraged attendees. (SAC ¶ 6-12).

Atkins is also a "widely-known, popular rap music performer who has been in the music scene for decades." (SAC ¶ 33). He is hugely influential, "draws thousands of people to concerts," and uses his fame to leverage this marketing power upon thousands of his fans and followers to promote events, including Fyre Festival, through social media and other channels. (SAC ¶ 32). He has a very strong following on Twitter and Instagram with over 200,000 followers on Twitter, and 575,000 followers on Instagram and a large group of recognizable influencer friends. (SAC ¶ 32). One of his Instagram posts states: "'REFUSE to DIE until HISTORY records my GREATNESS' FOR BOOKINGS CLICK LINK..." (SAC ¶ 32).

Defendant Atkins conceived, organized, marketed, promoted, advertised and funded the Fyre Festival and was responsible for its overall business strategy, guiding creative and facilitating artist relations. (SAC ¶ 32, 33, 49; Ex. A, 36). The Festival was Atkins' vision, together with defendant McFarland (who pled guilty to fraud and is likely headed to prison). (SAC ¶ 17-19, 46). Atkins engaged in promotion of the Fyre Festival and hired others, including celebries, to

---

[1] Plaintiffs' Second Consolidated Amended Class Action Complaint, ECF 56 ("SAC").

promote the Festival. (SAC ¶¶ 46-64). Atkins falsely lured thousands of consumers to purchase Fyre Festival tickets and merchandise by his actions and involvement with the Fyre Festival, and through his enormous social media presence.

The SAC spells out that Atkins actively and extensively promoted the Fyre Festival as a control person of the Fyre corporate entities, and as an influencer and marketer in his own right, through false representations through his and other social media, such as his influential Instagram account. Examples of Defendant's marketing and promoting the Fyre Festival are provided throughout the SAC, as well as Atkins' personal marketing posts. (SAC ¶¶ 32, 46-67). Specifically, some of the SAC's more notable allegations include:

- Atkins represented the festival as "the cultural experience of the decade," featuring entertainers like Blink-182, Migos, Rae Sremmurd, and Major Lazer, "first-class culinary experiences and a luxury atmosphere,"—all taking place on a "private island" in the Bahamas once owned by drug kingpin Pablo Escobar. (SAC ¶ 47).

- Atkins invested enormous amounts of time and money in promoting and advertising the festival domestically and internationally, engaged hundreds of online "influencers" called "Fyre Starters"—including numerous celebrities to promote the Fyre Festival and use social media to generate ticket sales, and created extravagant websites and mock-ups of the luxurious villas in which attendees would be staying. (SAC ¶ 47).

- Atkins made social media posts promising activities such as boats and jet skis for rent, and musical performances by "bands such as Blink-182 and Major Lazer," promising ticketholders could "start each day with morning yoga and guided meditation on the beach," while also enjoying "massages, henna tattooing, sound

healing, chill-out sessions and a festive Bahamian junkanoo parade kicking off each weekend," and pledged "a uniquely authentic island cuisine experience," with "local seafood, Bahamian-style sushi and even a pig roast." (SAC ¶ 47).

- Atkins represented, via the Fyre Festival website that Fyre Festival would include a "culinary experience catered by celebrity chefs;" luxury eco-friendly domes and villas that will "feel just like a hotel" with the "comforts of home;" and  musical bands that will be performing day and night; with an "all-star cast of performers, models, influencers, and thought leaders attending." (SAC ¶ 56, Ex. B, C).

- Atkins posted to his personal social media that "Fyre Festival looks set to be the biggest FOMO-inducing event of 2017," and on April, 27, 2017, one day before the event was to begin, he posted "The stage is set!!! In less than 24 hours, the first annual Fyre Festival begins." (SAC ¶¶ 63-64).

- Defendant's representations through advertising and social media included representations that the Festival would feature "Pusha T, Tyga, and Desiigner will be joining Major Lazer, Disclosure, Blink-182, Migos, and Lil Yachty—and the models—Kendall Jenner, Alessandra Ambrosio, Bella Hadid [and others]" "Famous models on yachts! Exclusive Island once owned by Pablo Escobar! Blink-182!", "the best in food, art, music, and adventure," (SAC ¶ 67).

Despite Atkins' public representations regarding this supposed "first-class culinary experiences and a luxury atmosphere," Atkins already knew this Festival would not deliver on its promises, and was likely to be a complete failure. Atkins cavalierly disregarded that the site for the Festival did not have a safe and proper infrastructure, that artists would not appear, and that attendees would be placed in a dangerous situation on a remote island.  Notably, the SAC alleges:

- Defendant had been aware for months that Fyre Festival "was dangerously under-equipped and posed a serious danger to anyone in attendance." The Festival "had no planned medical services, few showers, no electricity, few porta potties," and lacked the promised activities. (SAC ¶ 79).

- Individuals employed by Defendant have since acknowledged that no infrastructure for food service, accommodations, electricity or sanitation was in place as recently as a month before the event and that the few contractors who had been retained were refusing to work as they had not been paid. (SAC ¶¶ 80-81).

- The celebrity chefs had notified Defendant that they would not be appearing. (SAC ¶ 82).

- Defendant terminated the contract with Starr catering, who had been the advertised caterer for the event, without notifying the guests. (SAC ¶ 83).

- Bands had notified Defendant that they would not be appearing due to the lack of progress, none of which was reported publicly by Defendant, despite his knowledge of these facts. Defendant had not even secured a stage for the concert. There were also promises by Defendant of security with local law enforcement, private contractors, and even the Bahamian army; none of which had been secured. (SAC ¶ 84).

- Atkins was aware of the problems before the event and that his representations about the Festival were false. Troublingly, before Plaintiffs and other ticketholders had arrived, Defendant urged artists to not attend due to the dangerous and uninhabitable conditions that were present at the event venue. (SAC ¶ 86).

- Defendant Atkins was certainly aware that the representations about the Fyre

Festival were untrue. At least a month prior the event, in March 2017, Defendant Atkins arrived for a "site visit." However most of his time was spent on a yacht near the supposed Festival site. (SAC ¶ 87).

- Marketers for the event repeatedly made Defendant aware that the event would not be up to the standard he had advertised, something Defendant already knew or should have known. The marketing team advised, in or about March 2017, to Defendant, to postpone the event to 2018. They had a meeting with Defendant in March 2017, within a month before the planned event, to deliver the news, the Defendant rejected or ignored the warning and stated, "Let's just do it and be legends, man." Defendant approved the budget and marketing for the event even though Defendant knew that The Festival could not deliver. In the face of this knowledge, Defendant continued to sell tickets and merchandise to unwitting consumers. (SAC ¶ 89).

- On or about April 10, 2017, a few weeks before the Fyre Festival, when Atkins was already informed that the festival would fail, an entity known as EHL Funding LLC, extended a three million dollar loan for funding of the Fyre Festival and defendant signed a personal guarantee on the loan. Payments on the loan were to commence on April 14, 2017, and on that date and each week thereafter, 40 percent of the receipts from the Fyre Festival were to be paid to EHL Funding. At or around the time of the loan Atkins pushed consumers to load up more and more money on the cashless FyreBands. Defendant Atkins clearly knew the Fyre Festival was under mountains of debt, in trouble, that his own finances were on the line, and could not proceed as represented. (SAC ¶ 92).

14

Indeed, in March 2017 before the commencement of the Festival, where Atkins knew that he was putting consumers in danger because the infrastructure and other needed items for the Festival would not materialize, and while aboard a yacht, he boldly, recklessly, and irresponsibly toasted to the Festival's success: "To living like movie stars, partying like rock stars, and f***** like porn stars." (SAC ¶ 90). Viewed most favorably to Plaintiffs, this toast is reasonably interpreted as an acknowledgement of the likely failure of the Festival, and the cavalier decision to collect attendees' money and proceed with the Festival, regardless of the risks to attendees.

Fyre Festival, now a famously unmitigated disaster, did not transpire. Foreseeably, thousands of attendees, who were not informed of the Festival's failings, were left stranded on a remote island with no proper sanitation, shelter, or sufficient food, let alone the "cultural experience of the decade" that had been promised. Specifically, when guests arrived, they encountered insufficient electricity and sanitation (SAC ¶¶ 77, 81); "FEMA-style tents," (SAC ¶¶ 68-71, 77, 81); none of the promised gourmet foods, but rather "bread and cheese sandwiches," (SAC ¶¶ 68, 72, 77, 81); insufficient medical services (SAC ¶¶ 73, 79); no security (SAC ¶ 84); none of the musical performers or other artists that Defendant had promised (SAC ¶¶ 84, 85); and guests' belongings unceremoniously dumped from shipping containers onto the sand. (SAC ¶ 69). As a result, Festival guests described this event as "a complete disaster," "mass chaos," a "tent city," "hunger games," and a "horror movie plot." (SAC ¶ 77). Some guests even reported that they were mugged on the island. (SAC ¶ 84). Foreseeably, adding insult to injury, many attendees attempted to flee the island en masse, and experienced return travel nightmares. (SAC ¶ 75-76).

In stark contrast to Atkins' celebratory toast to "partying like rockstars" upon a yacht just a month beforehand, Atkins left the Festival attendees, like so many refugees, on a remote island without proper shelter. Attendees were tossed upon an undeveloped dirt lot, when all along, Atkins

knew or reasonably should have known that the Festival would not only fail to live up to Defendant's promises, but would even pose a dangerous risk to attendees due to lack of infrastructure and other provisions.

Atkins has acknowledged his role in this debacle, and even issued two "mea culpas" on his Twitter account, one on April 28, 2017, the day of the failed Festival and one on April 30, 2017. In these tweets Atkins stated, "I truly apologize…I'm deeply sorry to everyone who was inconvenienced by this." (SAC ¶ 97, Ex. D). In the April 30, 2017 tweet, Atkins stated: "Relieved to share that all guest [sic] are safe, and have been sent the form to apply for a refund. Our deepest apologies." (SAC ¶ 98, Ex. E). Atkins' apologies reveal that he knew he was responsible for this disaster. (SAC ¶¶ 97-99). Defendant Atkins also admitted that he engaged in false advertising in connection with the Fyre Festival as he made the following statement relating to the Fyre Festival. "That's not fraud, that's not fraud, False advertising, maybe — not fraud." (SAC ¶ 100).

Atkins' mea culpas, apologies and statements that he was going to take responsibility for the failed Fyre Festival and offer refunds, together with his control over the corporate entities and his active and direct involvement in marketing and other aspects of the Fyre Festival, evidences that he had a duty to Plaintiffs that he did not fulfill and that he should be responsible for the fraud and the other torts alleged herein that he committed against the Plaintiffs.

In his Motion to Dismiss Plaintiffs' Second Amended Complaint, each argument advanced by Defendant Atkins is devoid of merit, and the SAC states valid causes of action against him. Indeed, in response to Atkins' June 5, 2018 pre-motion to dismiss letter addressed to the earlier Consolidated Amended Complaint (ECF 49), Plaintiffs detailed in their June 11, 2018 letter (ECF 53) how the earlier CAC[2] was well-pled against Atkins. Nonetheless, Plaintiffs amended the CAC and, among other things, added numerous additional allegations pertaining to Atkins' wrongful

---

[2] Plaintiffs' Consolidated Class Action Complaint, ECF  41 ("CAC").

actions and inactions to an already well-pled CAC. Atkins' attorney, nonetheless, advances the same arguments in his July letter as he advanced in his June letter.

As alleged in the amended SAC and disregarded by Atkins' attorney in his July 6, 2018 letter, the SAC is replete with detailed allegations of Atkins' extensive involvement in the creation, organization, funding marketing and promotion of the Fyre Festival and Atkins' misrepresentations made about the Festival.

## **ARGUMENT**

## I.   **STANDARD OF REVIEW**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the non-moving party, a court finds that the non-moving party has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007). A complaint will survive a motion under Fed. R. Civ. P. 12(b)(6) if it states plausible grounds for non-moving party's entitlement to the relief sought, *id.* at 1965-66, i.e., it need merely contain sufficient factual allegations to raise a right to relief above the speculative level, *id.* at 1965. The issue before the Court upon consideration of such a motion is not whether the non-moving party "will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." *McDowell v. N. Shore-Long Island Jewish Health Sys., Inc.,* 839 F. Supp. 2d 562, 565 (E.D.N.Y. 2012) (citing to *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001)).

As set forth in detail below, Plaintiffs met this standard of review, well within the meaning of the foregoing case law, thus warranting denial of Atkins' motion in its entirety.

II.   **DEFENDANT'S "WELL-SETTLED DOCTRINES OF NEW YORK LAW" DO NOT APPLY**

Atkins claims that two "well-settled doctrines" preclude Plaintiffs' recovery. First, Atkins claims that a tort claim may not be asserted alongside a contract claim. However, Plaintiffs' tort claims may be asserted alongside their contract claims, because there was no contract between Atkins and Plaintiffs, Atkins had a duty to Plaintiffs, and because Plaintiffs may claim alternative claims to this Court. Next, Atkins' attempts to characterize his brazenly fraudulent statements as "puffery" fail. This is because Atkins' misrepresentations to Plaintiffs were sufficiently particular and credible, and were a far cry from the type of non-actionable "puffery" that Atkins tries to allege. Accordingly, these doctrines do not preclude Plaintiffs' claims.

A.   **Plaintiffs Do Not Assert A Breach of Contract Claim Against Atkins, And Even If They Did, Their Tort Claims Would Still Be Allowed**

No doctrine of law prevents Plaintiffs from asserting their tort claims alongside breach of contract claims. Plaintiffs do not assert that a contract existed between Atkins and Plaintiffs, and Plaintiffs assert no contract claims against him. Furthermore, Plaintiff's claims are based upon torts, not contracts.

The existence of a contract does not bar a tort claim. See e.g., Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp., 725 F. Supp. 656, 661 (N.D.N.Y. 1989) (quoting *Lord Electric Co. v. Barber Asphalt Paving Co.,* 226 N.Y. 427, 432 (Ct. App. 1919) holding that a cause of action sounding in tort, rather than contract, could be asserted against a subcontractor by a construction contractor for negligently construction). Specifically tort damages are still available to parties not in privity with the contracting party when there is a duty between the parties that is independent of the contract. *Morse/Diesel Inc. v. Trinity Industries, Inc.,* 655 F.

Supp. 346, 258-59 (S.D.N.Y. 1987); See *Price Brothers Co. v. Olin Construction Co., Inc.,* 528 F. Supp. 716, 721 (W.D.N.Y. 1981).

A breach of contract claim has not been asserted against Atkins as he admits, and Plaintiffs do not assert that they entered into a contract with him. Moreover, Plaintiffs' specific claims against Atkins sound in tort, not in contract. (SAC ¶¶ 120-156, 163-169, 176-270). Therefore, tort damages are still available to Plaintiffs, who were never in privity with Atkins.

Defendant argues that Atkins had no duty to Plaintiffs that was independent of the contract. However, first, Atkins was not a party to the contract, nor do Plaintiffs assert a contract claim against him. For this reason, Atkins cannot argue that the tort claims are an improper offshoot of the breach of contract claim asserted against other parties, or that the tort claims are merely a disguised breach of contract claim. Second, Plaintiffs' allegations show that, even if there was a contract, Atkins had a duty, independent from the contract, to disclose material facts, as he possessed superior knowledge not readily available to Plaintiffs, namely that the Festival was very likely to be a disaster without necessary provisions, and he knew that Plaintiffs acted based on his fraudulent statements. See Section II(B), *supra.*

Defendant cites to *Uitz v. Lustogman Firm, P.C.,* to support his position that Plaintiffs' tort claims are precluded by their contract claims. No. 13 CIV. 6040 RMB, 2014 WL 3767056 (S.D.N.Y. July 28, 2014). However, the *Uitz* plaintiff did not allege an independent duty owed by the tortfeasor, independent of the contract. *Id.* at *3. *Uitz* is further distinguished from this case because the tortious conduct in *Uitz* was governed by a contract between the parties. *Id.* at *1-4. Defendant's use of *Physicians Mut. Ins. Co.* and *Kallman* are dispositive for the same reasons. *Physicians Mut. Ins. Co. v. Greystone Servicing Corp.,* No. 07 CIV 10490 (NRB), 2009 WL 855648, at *5 (S.D.N.Y. Mar. 25, 2009) (dismissing fraud claim because the parties owed no

duty beyond the corporation's contractual obligations, and the tortious conduct was governed by a service agreement); *Kallman v. Pinecrest Modular Homes, Inc.,* 916 N.Y.S. 2d 221, 222 (N.Y. App. Div. 2011) (no legal duty independent of contract was alleged).

Accordingly, no "well settled doctrine" prevents Plaintiffs from asserting tort claims alongside contract claims, because Atkins had a legal duty to Plaintiffs independent of the contract, and because Plaintiffs asserted no contractual that applies to the tortious conduct.

**B.   Atkins Had A Duty to Plaintiffs Independent of The Contract**

Defendant claims that Plaintiffs allege no independent duty that Atkins owed to Plaintiffs, and that "Plaintiffs cannot articulate any purported duty without basing it on their status as parties to a contract with Fyre." However, Atkins had a duty to disclose material facts, as he possessed superior knowledge not readily available to Plaintiffs, and he knew that Plaintiffs acted based on his fraudulent statements. Furthermore, Plaintiffs do not assert contract claims against Atkins, and thus do not "base" any duty upon their status as parties to a contract.

A party to a business transaction has a duty to disclose material facts in certain circumstances, including where the party has made a partial or ambiguous statement; when there is a fiduciary or confidential relationship; and where one party possesses superior knowledge, not readily available to the other, and knows that the other acts on the basis of mistaken knowledge. See *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *Sofi Classic S.A. de C.V. v. Hurowitz,* 444 F. Supp.2d 231, 243 (S.D.N.Y. 2006). In addition, *Clark -Fitzpatrick, Inc. v Long Is. R.R. Co.,* 70 N.Y.2d 382, 389 (1987), cited by Atkins, is actually supportive of sustaining Plaintiffs' tort claims, as the case acknowledges that tort claims based upon duties independent of a contract are viable. Courts have held that a legal duty independent of contractual obligations may be imposed by law due to the parties' relationship and defendants

can be held liable in tort for failure to exercise reasonable care, irrespective of a contract.

*Bullmore v. Banc of America Securities LLC,* 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007).

Here, Plaintiffs' tort claims are properly alleged against Atkins. This is because the SAC shows that Atkins possessed superior knowledge, not readily available to Plaintiffs, and reasonably knew that Plaintiffs were acting on the basis of mistaken knowledge. Specifically, Plaintiffs alleged that Atkins was chief promotor, owner, founder, director, officer, and financial backer for Fyre Festival. (SAC ¶ 143). This creates the strong inference that Atkins possessed superior knowledge as to Fyre Festival. In addition, Atkins was expressly informed that the Festival would be a failure. The SAC alleges:

> Marketers for the event, engaged by Defendants, repeatedly made Defendants Atkins, Margolin and McFarland aware that the event would not be up to the standard they had advertised, something Defendants already knew or should have known and certainly could have discovered long before the marketing began. The best idea, the marketing team said, in or about March 2017, to Defendant, including Atkins, Margolin and McFarland, would be to roll everyone's tickets over to 2018 and start planning for the next year immediately. They had a meeting with Defendants Atkins, Margolin and McFarland, in March 2017, within a month before the planned event, to deliver the news, wherein McFarland, Atkins and Margolin rejected or ignored the warning and the marketing team or McFarland, Atkins or Margolin stated, "Let's just do it and be legends, man." Defendants approved the budget and marketing for the event was to proceed even though Defendants knew that they could not deliver. In the face of this knowledge, Defendants continued to sell tickets and merchandise to unwitting consumers. (SAC ¶ 89).

Furthermore, Atkins' toast to "partying like rock stars" aboard a yacht, and his two public "mea culpas" further create a reasonable inference that, not only was he responsible for attendees' damages due to the information he withheld, but Atkins was even aware of his own responsibility for not sharing his superior knowledge of the Festival's likely failures. (SAC ¶ 89).

Clearly, Atkins had superior knowledge as to the likelihood that the Festival would be a disaster, this information was not available to Plaintiffs, and by continuing to market the event, Atkins reasonably knew that prospective attendees were relying on his misrepresentations.

Atkins therefore owed a duty to Plaintiffs, independent of the contract, to not place them in a dangerous situation on an island without adequate food and shelter. (SAC ¶¶ 122-123, 129-130). Atkins, as chief promotor, celebrity and influencer, stood in the very sort of relationship that gives rise to a duty, namely a relationship where Atkins was inducing consumers to travel to a remote island for a luxurious festival in reliance that there would be food, shelter, musical acts and celebrities.

Defendant argues that Plaintiffs only alleged that Atkins had a duty by virtue of Plaintiffs' status as "ticketholders," and this purported duty was therefore duplicative with the contract. However, this is a mischaracterization; as shown *supra,* Atkins also had a duty to prospective Festival-goers based upon his superior knowledge of the Festival and his knowledge that they would rely upon his fraudulent statements, which arose independently from, and extraneously to, the contract. Furthermore, Plaintiffs do not assert a contract between themselves and Atkins, so their claims cannot be "duplicative" of such a contract.

But Atkins maintains the existence of a contract, and claims that Plaintiffs would have to prove a fiduciary relationship existed between themselves and Atkins, citing *Accusystems, Inc. v. Honeywell Info. Sys., Inc.,* 580 F. Supp. 474, 481 (S.D.N.Y. 1984). However, this misstates case law, because *even if a valid contract existed,* Plaintiffs could still support their fraud claims if they "(i) demonstrate a legal duty separate from contractual duties; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentations and unrecoverable as contract damages." *Moses v. Martin,* 360 F. Supp. 2d 533, 543 (2004). As shown, *supra,* Plaintiffs have at least shown a duty "separate from the duty to perform under the contract"—because there was no contract—and they have shown "a fraudulent misrepresentation extraneous to the contract," because even if a

contract was formed between Plaintiffs and the corporate entities, Atkins' fraudulent statements were extraneous to that contract, see Section II(C) *infra*.

Because Plaintiffs alleged that Atkins owed them a legal duty that arose independently of the contract, and because his statements were extraneous to the contract, Plaintiffs' tort claims can be asserted alongside their contract claims.

### C. <u>Atkins' Statements Do Not Qualify As Puffery</u>

Atkins asserts that his fraudulent statements were mere "puffery." However, his statements were sufficiently particular and therefore do not qualify.

To qualify as puffery, statements may be "too general" for a reasonable consumer to rely upon them, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 206 (2d Cir. 2009), thus cannot have misled a reasonable consumer and are not actionable. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir. 1996). Puffery "lack[s] the sort of definite positive projections that might require later correction." *Id.* (quoting *In re Time Warner,* 9 F.3d at 259, 267 (2d Cir. 1993)). To examine whether statements qualify as "puffery," courts examine the context in which the statements were made. *In re Virtus Investment Partners, Inc. Securities Litigation,* 195 F. Supp. 3d 528, 537-38 (S.D.N.Y. 2016).

Defendant attempts to say that Plaintiffs' reliance was unreasonable, as Atkins' statements were mere "puffery." However, the SAC shows that Atkins' statements were sufficiently particular as to the Festival, and Plaintiffs were perfectly reasonable in their reliance. Specifically, the Complaint alleged that Defendant:

- Stated that Fyre Festival would be filled with exclusive culinary experiences and famous models on yachts on a private island owned by Pablo Escobar. (SAC ¶ 46).

- Stated that Fyre Festival would be "the cultural experience of the decade," featuring A-list entertainers like Blink-182, Migos, Rae Sremmurd, and Major Lazer, "first-class culinary experiences and a luxury atmosphere." (SAC ¶ 47).

- "engaged hundreds of online "influencers" called "Fyre Starters"—including Kendall Jenner, Bella Hadid, and Emily Ratajkowski—to promote the Fyre Festival and generate ticket sales, and created extravagant websites and mock-ups of the luxurious villas in which attendees would stay (SAC ¶ 48).

- Promoted Fyre Festival as a "two-weekend A-list experience with alcohol, fine dining and party-goers. Furthermore, attendees were promised…boats and jet skis for rent, and musical performances by bands such as Blink-182 and Major Lazer." Ticketholders were also told they could "start each day with morning yoga and guided meditation on the beach," and enjoy "massages, henna tattooing, sound healing, chill-out sessions and a festive Bahamian junkanoo parade." Descriptions of the food options pledged "a uniquely authentic island cuisine experience," with "local seafood, Bahamian-style sushi and even a pig roast." (SAC ¶ 51).

- Published social media that claimed Fyre Festival would be "biggest FOMO-inducing event of 2017," which included a photo of swimsuit models at sea. (SAC ¶¶ 62-63), and another post claiming ""The stage is set!!! In less than 24 hours, the first annual Fyre Festival begins." (SAC ¶ 64).

Clearly, Atkins' numerous statements made specific promises, including the quality of food, activities and recreation. His statements even included specific names of artists who would attend and dishes that were to be served, *supra*. There is no apparent reason why a prospective attendee would not rely on these statements. They are specific, contain "positive projections," and do not qualify as puffery. *San Leandro Emergency Med. Grp.,* 75 F.3d at 811; *In re Time Warner,* 9 F.3d at 267. In addition, the SAC states that Atkins was chief promotor, owner, founder, director, officer, and financial backer for Fyre Festival. (SAC ¶ 143). Therefore, the Plaintiffs perceived Atkins' statements regarding his own Festival as particularly credible.

Defendant tries to dismiss some of Atkins' more extreme statements as "puffery." And while Atkins' claim that the Festival would be "the biggest FOMO-inducing event of 2017," this statement may qualify as puffery *as to whether the Festival was, indeed, "FOMO-inducing,"* as such statement is not a "positive projection that would require later correction." Likewise, the promise that the event would be "Coachella x 1000" might constitute puffery *as to whether the event truly was 1000 times better than Coachella,* as there is no objective way to measure whether the event qualified as "Coachella x 1000." However, these statement could still reasonably be relied upon as to whether this event was still even scheduled to occur, and as to whether the event would deliver on some of its promises, especially when viewed in the context of Atkins' position as Founder of the Festival, and in light of his other statements, *supra. In re Virtus Investment Partners, Inc.,* 195 F. Supp. 3d at 537-38.

Defendant also tries to compare this case with *Bd. Of Managers of 250 Bowery Condo,* but this case is distinguished. The *Bowery Condo* case held that a brochure's promises of "luxury building," "premier caliber," and "highest quality" qualified as puffery. *Bd. Of Managers of 250 Bowery Condo. v. 250 VE LLC,* 2018 NY Slip Op 31168(U), *8 (N.Y. Sup. Ct. 2016). However,

these were mere "opinions of value," whereas Atkins' specific promises as to who would perform at the festival and what food would be available were sufficiently definite and qualified as positive projections.

Atkins' statements were sufficiently specific and credible to be reasonably relied on by Plaintiffs, and therefore did not constitute puffery.

## III. PLAINTIFFS PROPERLY STATE COMMON-LAW CLAIMS

### A. Plaintiffs State A Case For Fraud

#### 1. Plaintiffs' Allegations Meet The Heightened Pleading Standards of 9(b)

Throughout Plaintiffs' CAC, they alleged specifics as to Atkins' fraudulent statements, including names, dates, content, and allegations regarding Atkins' state of mind when he made the statements. Plaintiffs' nonetheless agreed to amend, and the SAC alleged even more regarding the "who," "what," "when" and "where" of Atkins' fraudulent conduct. As such, the SAC meets the heightened pleading standards of Rule 9(b).

To adequately state a fraud claim, the circumstances constituting fraud or mistake "shall be stated with particularity." Fed.R.Civ.P. 9(b); *DeVaney v. Chester,* 709 F. Supp. 1255, 1260 (S.D.N.Y. 1989). Rule 9(b)'s purpose is "to assure a party accused of fraud fair notice of the alleged wrongdoing sufficient to enable him to prepare a defense, to forestall…conclusory allegations…and to inhibit the assertion of unfounded fraud claims against perceived 'deep-pockets for the nuisance settlement value.'" *DeVaney,* 709 F. Supp. at 1260. Fraud allegations should specify the time, place, speaker, and content of the alleged misrepresentations. See *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986).

In addition, a present expression of intent to perform a future act is actionable as fraud if it is made with preconceived and undisclosed intention of not performing it. *M & T Mortg. Corp.*

*v. White,* 736 F. Supp. 2d 538 (E.D. N.Y. 2010); *Watts v. Jackson Hewitt Tax Service Inc.,* 579 F.

Supp. 2d 334 (E.D. N.Y. 2008).

Here, Plaintiffs meet the heightened pleading requirements of Rule 9(b) as may be

applicable for fraud and any other claims. Plaintiff's CAC was already well-pled as to Atkins

regarding allegations of fraud. The CAC alleged that Ja Rule actively and extensively promoted

the Fyre Festival through false representations through his and other social media, such as his

Instagram account, and examples of Defendant's marketing and promoting the Fyre Festival are

provided throughout the CAC. (CAC ¶¶ 38-51). Further, the CAC alleged that Defendant

knowingly lured attendees with false and fraudulent pretenses, and knew the Fyre Festival was

going to be a colossal failure that would place the lives of attendees in danger for weeks if not

months in advance. (CAC ¶¶ 6-8, 62-79).

Despite the particularity of the allegations in Plaintiffs' CAC, Plaintiffs agreed to amend

their Complaint. Accordingly, the SAC contains numerous representations made by Defendant,

including Atkins, and numerous allegations that Defendant knew of the statements' falsity and

intended to defraud consumers. (SAC ¶¶46-67, 78-101). Specifically, the SAC states

"Defendants knew that Fyre Festival would be a disaster and were knowingly lying about the

Fyre Festival's accommodations" but despite this knowledge, "Defendants continued to heavily

promote the event and sell ticket packages." (SAC ¶ 8). The SAC further states that "Defendants

Margolin, Atkins and McFarland repeatedly ignored reports that there was no way that the Fyre

Festival could take place due to lack of infrastructure and other insurmountable problems." (SAC

¶ 8). The SAC also states that "Defendant Atkins knew, at the time of this post, that the

representation in the social media post was false as the stage was not set as the performers had

either been told by Defendants, including Atkins, not to attend or had cancelled," (SAC ¶ 64),

and that "Defendant Atkins was also directly involved in working with the Bahamian government to obtain a site for the Fyre Festival, knew months before the planned event that there was no infrastructure for the site and that it was unsuitable and unsafe for the event." (SAC ¶ 66).

Despite Atkins' knowledge that the festival would be a disaster, Atkins made statements of intent to perform the future act (holding a festival that lived up to reasonable expectations) with the preconceived and undisclosed intention of not performing, as alleged by the SAC. For example, the SAC makes clear that Atkins promised to the public that "The stage is set!!! In less than 24 hours the first annual fyrefestival begins," and includes a screenshot of this social media post that shows the day and time it was made by Atkins. (SAC ¶ 64). The SAC also states that Atkins posted to public social media that "Fyre Festival looks set to be the biggest FOMO-inducing event of 2017." (SAC ¶ 64). Further allegations state that Atkins represented that the event would feature "Famous models on yachts! Exclusive Island once owned by Pablo Escobar! Blink-182," "The best in food, art, music, and adventure," and other promises, via social media, and the SAC includes links to access this social media content. (SAC ¶ 67). Further, Atkins was specifically informed by the marketing team that the event was likely to be a disaster and should be rescheduled for the following year, but despite this knowledge, Atkins forged ahead with marketing the event because he wanted to become "legend." (SAC ¶ 89). Lastly, Atkins toasting to the success of Fyre Festival and to "partying like rock stars," aboard a yacht just a month before the festival, when he had been informed of the Festival's likely failure, shows that he consciously disregarded his responsibilities to follow through on his promises.

Clearly, the SAC states fraud allegations with sufficient particularity, including details as to time, place, speaker, and content of the alleged misrepresentations. *Luce v. Edelstein,* 802 F.2d

28

49, 54 (2d Cir.1986). Further, the SAC makes clear that Atkins made present expressions of intent to perform future acts with preconceived and undisclosed intention of not performing them. *M & T Mortg. Corp.,* 736 F. Supp. 2d 538; *Watts,* 579 F. Supp. 2d 334.

Defendant attempts to compare this case to those where "no affirmative misrepresentation[s were] made" and where the defendant did not owe a legal duty. *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146, 153 (2d Cir. 1995); *Nat'l Union Fire Ins. Co. v. Red Apple Group, Inc.,* 273 A.D.2d 140, 141 (1st Dep't 2000). However, these cases are inapposite because Atkins made affirmative statements that were reasonably relied upon as to the Festival's musical lineup, food and accommodations. Furthermore, Atkins owed an independent legal duty to Plaintiffs, see Section II(B), *supra.*

The SAC alleges abundant details regarding the "who," "what," "when" and "where" of Atkins' fraudulent conduct. As such, the SAC meets the heightened pleading standards of Rule 9(b).

## 2. The SAC Shows Atkins Intended to Defraud Plaintiffs

Defendant argues that Plaintiffs' SAC fails to plausibly plead intent to defraud. However, the SAC makes clear that Atkins did have the requisite intent because he knew that Plaintiffs would rely upon his representations, would purchase tickets and attend the festival in reliance.

In an action asserting fraudulent misrepresentation or inducement under New York law, courts apply a more general standard for scienter, rather than the heightened requirement under Federal Rules of Civil Procedure, for the simple reason that a plaintiff realistically cannot be expected to plead a defendant's actual state of mind; therefore, the requisite intent of the alleged speaker of the fraud need not be alleged with great specificity. *Woods v. Maytag Co.,* 807 F. Supp. 2d 112, 119 (E.D.N.Y. 2011); *In re Mercator Software, Inc. Securities Litigation,* 161 F.

Supp. 2d 143 (D. Conn. 2001); *Campbell v. Freshbev LLC,* 1:16–cv–7119(FB)(ST), 2018 WL

3235768 (E.D.N.Y. 2018). A plaintiff may establish a strong inference of fraudulent intent when

the alleged facts permit an inference that a defendant intended to defraud. *Woods,* 807 F. Supp.

2d at 119; *Pryor v United States Steel Corp,.* 591 F. Supp. 942 (S.D.N.Y. 1984).

Here, the SAC states that Defendant intended that the representations would induce

Plaintiffs to act on these representations, purchase tickets to Fyre Festival and incur other related

expenses in connection with the Fyre Festival. (SAC ¶ 13, 141, 240, 256). In addition, Plaintiffs

alleged facts to create a strong inference, not only of Atkins' intent to defraud, but also as to his

motive for intentionally making fraudulent statements. Specifically, the SAC alleges that

"Atkins…guaranteed a multimillion dollar loan which needed to be paid in substantial part

before the commencement of the Festival, and the easiest way to try to repay it was to collect

money from consumers under false pretenses and fail to provide the experience for which

consumers contracted." (SAC ¶ 168). Furthermore, by promoting the event, Atkins was

promoting ticket sales, the proceeds from which "directly reduced the amount of the outstanding

loan regarding the Fyre Festival and hence reduced the liability of…Atkins as [a] personal

guarantor[] of the loan." (SAC ¶ 180). In addition, the Complaint strongly infers that despite

Atkins' knowledge of the event's likely failure he continued to promote it simply because he was

motivated by notoriety. Specifically, the SAC states that Atkins ignored warnings from the

marketing team by continuing to promote the event in order to become a "legend." (SAC ¶ 89).

The SAC also describes Atkins' toast to the Festival's success and to "partying like rock stars,"

despite his knowledge of the Festival's likely failure. (SAC ¶ 89). These allegations create a

strong inference that Atkins intentionally defrauded consumers in order to reduce his own

liability and/or to gain notoriety from helping the organize and promote the event.

Defendant attempts to say that Plaintiffs have not alleged a plausible or "compelling" motive on the part of Atkins for defrauding Plaintiffs because Atkins' and Plaintiffs' motives for making the Festival a success were "fully aligned." However, Atkins' motive for the fraudulent conduct included becoming "legend" by being associated with the event and enhancing his own notoriety (SAC ¶ 89), as well as reducing his own liability for a loan. (SAC ¶ 180). Plaintiffs would gain neither of these benefits from attending the festival, hence Atkins and Plaintiffs' interests were not "aligned." Furthermore, the facts that Atkins may have also obtained a benefit if the Festival *had* been a success is irrelevant to whether he *also* had a motive for fraudulently promoting the event despite his knowledge of its almost-certain failure, and is of no import.

The SAC sufficiently alleges that Atkins intended to defraud Plaintiffs, and at least creates a strong inference of Atkins' fraudulent intent and motives.

### 3. Plaintiffs Reasonably Relied Upon Atkins' Statements

Reliance is adequately alleged by Plaintiffs' purchase of tickets to and/or attending the Fyre Festival and purchasing merchandise, and their reliance was reasonable in light of the information available to them and Atkins' position as founder and backer of the Festival.

In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view, focusing on "the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *JP Morgan Chase Bank v. Winnick,* 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004). "Ordinarily there is no duty to exercise due diligence, and [courts] have described the necessary showing of care as 'minimal diligence' or 'negating its own recklessness.'" *Id.* (quoting *Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophides,* 106 F.3d 22, 26-27 (2d Cir. 1997)).

In some instances, statements may be "too general" for a reasonable consumer to rely

upon them, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553

F.3d 187, 206 (2d Cir. 2009), and thus cannot have misled a reasonable consumer. *San Leandro*

*Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.

1996). Puffery "lack[s] the sort of definite positive projections that might require later

correction." *Id.* (quoting *In re Time Warner,* 9 F.3d at 259, 267 (2d Cir. 1993)). To examine

whether statements qualify as "puffery," courts examine the context in which the statements

were made. *In re Virtus Investment Partners, Inc. Securities Litigation,* 195 F. Supp. 3d 528,

537-38 (S.D.N.Y. 2016).

Here, the SAC alleges that Plaintiffs relied upon Atkins' statements in their decision to

purchase Fyre Festival tickets or merchandise. (SAC ¶¶ 102, 144). The SAC further states that

Plaintiffs would not have so acted, had they known "that they were not going to be receiving the

accommodations, amenities, security and access to activities that they were told they were going

to experience at the Fyre Festival." (SAC ¶ 144).

Furthermore, Plaintiffs' reliance upon Atkins statements was reasonable, in light of the

relationship between Plaintiffs and Atkins, and in light of the amount of information available to

Plaintiffs. Specifically, the SAC alleges that Atkins was a "widely known, popular rap music

performer…he is a celebrity…who draws in thousands of people to concerts. He is also an

influencer who has a very strong following on Twitter and Instagram…was a founder, owner,

director and officer of Fyre Media and its subsidiary Fyre Festival LLCC…and controlled these

entities….conceived, organized, marketed, promoted, advertised and funded the Fyre Festival

and was responsible for overall business strategy, guiding creative and facilitating artist

relations." (SAC ¶¶ 32-33). In addition, Atkins made numerous social media posts regarding the

festival, which reasonably indicated to Plaintiffs that he had inside information as to the

Festival's musical lineup, accommodations, and more. (SAC ¶¶ 46-53, 55-65). Clearly, the

relationship between Plaintiffs and Atkins was one in which Plaintiffs would reasonably rely

upon Atkins statements regarding the desirability of attending Fyre Festival. In addition,

Plaintiffs did not have access to the same information that Atkins had, namely, that there was no

adequate shelter, food, no proper infrastructure for power or sanitation, and that the festival was

likely to be an unmitigated disaster. (SAC ¶¶ 6-8, 14, 16, 78-101). Given Atkins' position and

the disparity of the information known to Atkins and Plaintiffs, Plaintiffs' reliance upon Atkins'

statements was reasonable.

Defendant attempts to say that Plaintiffs' reliance was unreasonable, as Atkins'

statements were mere "puffery" and did not constitute promises as to the Festival's quality. For

analysis on puffery, see Section II(E), *supra*.

There was nothing unreasonable about Plaintiffs' reliance upon the statements made by

the Festival's founder—Atkins—an influential celebrity who marketed the Festival as a "luxury

event" and made specific promises about the festival's shelter, food and musical lineup.  Their

reliance upon Atkins' sufficiently particular statements was reasonable.

### B.  <u>Plaintiffs Stated a Case For Negligent Misrepresentation</u>

Atkins claims that the SAC does not show Atkins negligent misrepresentations. However,

Atkins' fraudulent statements are alleged with abundant particularity, and the allegations show

that Atkins had a duty to Plaintiffs, and negligent misrepresentation is therefore adequately pled.

### 1. The SAC is Sufficiently Particular

Plaintiffs pled with sufficient particularity, per Rule 9(b). See reasoning set forth in Section III(A)(1), *supra* for why Plaintiffs' statements adequately showed the speaker, time, place and content of Atkins' misrepresentations.

### 2. The SAC Sufficiently Alleges a Special Relationship, and Plaintiffs Reasonably Relied Upon His Statements

Plaintiffs have shown that they had a special relationship with Atkins. See reasoning set forth in Section II(B), *supra* for why Atkins had a duty to disclose material facts because he possessed superior knowledge not readily available to Plaintiffs. Plaintiffs also showed that they reasonably relied upon his statements, see Section III(A)(3) and II(E).

### C. <u>Plaintiffs State A Case For Negligence and Gross Negligence</u>

Plaintiffs adequately alleged a case for negligence and gross negligence because Atkins created the impression that he spoke with authority, Plaintiffs were foreseeable victims of Atkins' fraudulent statements, and because Atkins was aware that the event was likely to be a disaster.

The scope of an actor's duty of care to a plaintiff depends on the relationship of the parties, whether the plaintiff was within the zone of foreseeable harm, and whether the harm, the accident, was within the class of reasonably foreseeable hazards that the duty exists to prevent. *Breitkopf v. Gentile,* 41 F. Supp. 3d 220 (E.D. N.Y. 2014). To be considered foreseeable, the precise manner in which the harm was inflicted need not be perfectly predicted. *In re September 11 Litig.,* 280 F. Supp. 2d 279, 295 (S.D.N.Y. 2003). When a defendant creates the impression that she acts with authority, she may create a duty of care to those who rely on this authority. See *Breitkopf,* 41 F. Supp. 3d at 271-272.

The Second Circuit defines gross negligence as "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *American Telephone and Telegraph Co. v. The City of New York et al.,* 83 F.3d 549, 556 (2d Cir.1996). To qualify as gross negligence, "the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care." *Curley v. AMR Corp., et al.,* 153 F.3d 5, 13 (2d Cir.1998) (quoting 79 N.Y. Jur.2d Negligence § 37 (1989)). To establish a prima facie case in gross negligence, a plaintiff "must prove by a fair preponderance of the credible evidence" that the defendant "not only acted carelessly in making a mistake, but that it was so extremely careless that it was equivalent to recklessness." *Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet,* 414 F. Supp. 153, 160 (S.D.N.Y. 1975).

Here, when Atkins made numerous statements strongly implying that he had inside information as to the Festival's featured qualities, he created the impression that he acted with authority. (SAC ¶ 46- 48, 51, 62-64). Accordingly, the Plaintiffs reasonably relied upon this authority. As a foreseeable result, thousands of Festival attendees were stranded with insufficient access to promised food, shelter, activities or entertainment. Specifically, Atkins stated that this event would feature "exclusive culinary experiences" (SAC ¶ 46), "luxurious villas" (SAC ¶ 48), "fine dining" and "a uniquely authentic island cuisine experience," with "local seafood, Bahamian-style sushi and even a pig roast." (SAC ¶ 51). Such claims would reasonably leave prospective attendees with no doubt that at least *sufficient* food and shelter would be available, and there would be no cause for attendees to have to rely upon other provisions. These Plaintiffs were therefore within the zone of foreseeable harm for Atkins, and the hazards that were posed to thousands of ticketholders were reasonably foreseeable.

Further, because Fyre's marketing team made Atkins aware that the event would not be up to the standard they had advertised, and this was something Atkins already knew or should have known long before the marketing began, his marketing statements that promoted the festival as a "luxury event" were made in reckless disregard for the rights of others, and qualified as gross negligence. (SAC ¶ 89).

Defendant attempts to say that the individual plaintiffs failed to allege any breach of duty, or any injury proximately caused by a breach of that duty, and implicitly attempt to limit the individual Plaintiffs' (Jung, Mainero, Herlihy, Jutla, Pittas, Wilson, and Lauriello) allegations to only include the paragraphs that specifically mention each individual Plaintiff, respectively. However, the SAC in its entirety describes in detail the experience of "Plaintiffs," "class members," "guests" and "attendees," generically, including Plaintiffs' frightening experiences with lack of basic provisions. (SAC ¶¶ 68-73, 77, 79, 81, 84-85). Because the individual Plaintiffs obviously qualify as such, the allegations are also asserted on behalf of these individual Plaintiffs. Furthermore, the SAC states that "Plaintiffs and other Class members relied on Defendants' misrepresentations and omissions regarding the experience and accommodations. Plaintiffs, the Class, and the Subclasses…have been damaged by Defendants' deceptive, negligent, and unfair conduct and wrongful inaction in that they purchased tickets for, and other items associated with the Fyre Festival, that they would not have otherwise purchased, had Defendants not misrepresented the experience of attending the Fyre Festival or warned them of the potential harms caused by attending the event." (SAC ¶ 102). Accordingly, even if there is any doubt that the SAC's narrative described the experience of all or most of Plaintiffs, this allegation makes clear that Atkins made misrepresentations, breached duties, and caused damages to the individual Plaintiffs.

Accordingly, because of the relationship between the parties and the information that was available to Plaintiffs, it was foreseeable that Plaintiffs would rely upon Atkins statements and become stranded without proper access to provisions as a result. In making these statements, Atkins showed a reckless disregard for the rights of Plaintiffs and was therefore both negligent and grossly negligent.

## D.  Plaintiffs State A Case For Tortious Interference With Contract

Atkins acted in bad faith in serving his own self-interests when he made the fraudulent statements to Plaintiffs, and thus may not claim immunity from interference with contract.

A corporate officer charged with inducing a breach of contract may be immune, if the officer acted in good faith, but "when the corporate officer commits independent torts or predatory acts directed at another, he may not seek refuge behind the mantle of immunity." *Countrywide Publications, Inc. v. Kable News Co.,* 74 A.D.2d 522, 522-523 (1980) (quoting *Buckley v. 112 Central Park South,* 285 App.Div. 331 (1954)). Courts therefore recognize that a corporate director, officer, or employee who is acting to serve his own personal interests may be liable for tortiously interfering with a corporate contract. *Vassardakis v. Parish,* 36 F. Supp. 1002 (D.C.N.Y. 1941); *Navarro v. Fiorita,* 271 App. Div. 62 (1946); *Rendich v. Preferred Mut. Fire Ins. Co.,* 274 App. Div. 800 (1948); *Buckley v. 112 Central Park South, Inc.,* 285 App. Div. 331 (1954). Similarly, an officer who perpetrates "separate torts" such as fraud, may not claim immunity from interference with contract. See *Recovery Racing, LLC v. Sunrise Motors, LLC,* No. 12834–04, 2005 WL 3193701, at *6 (Sup. Ct. Nassau Cty. 2005) (citing *Greyhound Corp. v. Commercial Cas. Ins. Co.,* 259 A.D. 317, 320-21 (1940)).

Here, it does not matter that Atkins was a corporate officer, because he was acting in his own personal interests, and because his statements were fraudulent. For example, the Fyre

Festival marketing team informed Atkins that the festival would likely be a disaster, and that it should be postponed until the following year. But despite this information, Atkins ignored the warning and said "Let's just do it and be legends, man." (SAC ¶ 89). In addition, Atkins made a toast to the success of the Festival and to "partying like rock stars," despite his contemporaneous knowledge of the Festival's probablE fate. (SAC ¶ 80). This shows that Atkins acted in his own self-interest in fame and self-promotion when he continued to promote the Festival, and encouraging the "Fyre Starters" to continue promoting the festival. This shows that Atkins "may not seek refuge behind the mantle of immunity." *Countrywide Publications, Inc.,* 74 A.D.2d at 522-523.

In addition, because Atkins engaged in fraud, see Section III(A), *supra*, he is not entitled to immunity as a corporate officer.

Defendant's position that Atkins could not have known of these contracts, i.e. tickets being sold, is disingenuous. Specifically, the SAC alleges that Atkins was an influential performer who draws in thousands of people to concerts, that he has a strong social media presence, and that he actively marketed the Fyre Festival. (SAC ¶¶ 32-33). The SAC also details Atkins' numerous social media posts promoting the festival. (SAC ¶¶ 46-53, 55-65). Of course Atkins knew—intended, even—that his followers, and others, were buying tickets to the event based upon his representations. To try and divorce Atkins from the reality that the public continued to purchase the very tickets that Atkins was promoting is not supportable.

Because of Atkins' fraudulent, self-interested conduct in misrepresenting Fyre Festival to prospective attendees, he cannot claim immunity from interference with contract, nor can he now claim that the reality of ongoing ticket sales was somehow unknown to him. Accordingly, Atkins is liable for tortious interference with contract.

**E.   Plaintiffs State A Case For Unjust Enrichment**

Under the New York doctrine of unjust enrichment, courts may infer the existence of an implied contract to permit one person who has obtained a benefit from another from unjustly enriching himself at the party's expense. See *Mathias v. Jacobs,* 238 F. Supp. 2d 556, 571 (S.D.N.Y. 2002) (citations omitted). The rule applies to situations where, absent a valid agreement governing legal relationships in a particular transaction, the party sought to be charged has possession of money or other property that "in good conscience and justice he should not retain, but should deliver to another." *Id.* (quoting *Matarese v. Moore–McCormack Lines,* 158 F.2d 631, 634 (2d Cir. 1946)). A valid contract may be a bar to a claim for unjust enrichment only where the subject matter of the claim is covered by the contract. *Seifts v. Consumer Health Solutions LLC,* 61 F. Supp. 3d 306 (S.D.N.Y. 2014) (applying New York law). Where a bona fide dispute exists as to the existence, or applicability, of a contract, the plaintiff may proceed on both breach of contract and quasi-contract theories. *Georgetown Co., LLC v. IAC/Interactive Corp.,* 2018 NY Slip Op. 32078(U), 2018 WL 4048051, at *8 (N.Y. C.C.D August 21, 2018). Accordingly, in a contract for services, if it is not clear whether the services performed by a defendant were covered by the contract, the unjust enrichment claim is not precluded. *Id.*

Here, Atkins was unjustly enriched at Plaintiffs' expense because he was "unjustly enriched by, among other things, compensation or remuneration based, in whole or part on ticket and merchandise sales," and the proceeds of sales of tickets and merchandise "directly reduced the amount of the outstanding loan regarding the Fyre Festival and hence reduced the liability" of Atkins as personal guarantor of the loan. (SAC ¶ 180). Defendant Atkins also received or was promised financial remuneration for appearing at the Fyre Festival. (SAC ¶ 180).

Defendant Atkins argues that, because a purported contract exists, the contract bars Plaintiffs' unjust enrichment claims. However, if a valid contract does exist to which Atkins was a party, Atkins has not put that contract into the record in this case. Furthermore, even if a contract did exist between the Fyre Festival corporate entities and Plaintiffs, that contract concerned Plaintiffs' admittance into the Fyre Festival, but did not cover Atkins' fraudulent statements about the quality or desirability of attending Fyre Festival, despite his knowledge that the Festival was doomed to fail. There is therefore a bona fide dispute as to the existence of a contract between Atkins and Plaintiffs, and whether any contract applied to the fraudulent conduct at issue. *Seifts,* 61 F. Supp. 3d 306; *Georgetown Co., LLC,* 2018 WL 4048051, at *8. Plaintiffs' unjust enrichment claims are therefore not precluded by any contract.

## IV.    PLAINTIFFS PROPERLY ASSERT STATUTORY CLAIMS

### A.    Plaintiffs State A Claim Under California's False Advertising Law

Plaintiffs have standing under the UCL because the SAC creates a strong inference that Plaintiffs saw, and relied upon, Atkins' misrepresentations and because the general public was likely to be deceived.

California's Unfair Competition Law and False Advertising Law provides: "[i]t is unlawful for any person ... corporation or association, or any employee thereof ... to disseminate or cause to be so made…any such statement as part of a plan or scheme with the intent not to sell that personal property or those services…so advertised at the price stated therein, or as so advertised." Cal. Bus. & Prof. § 17500; *Laster v. T-Mobile USA, Inc.,* 407 F. Supp.2d 1181 at 1193 (S.D. Cal. 2005). The FAL prohibits "not only advertising which is false, but also advertising which [,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Leoni v. State Bar,* 39 Cal.3d 609, 626

(1985). To show standing, plaintiffs must show they "suffered injury in fact and has lost money
or property as a result of such unfair competition." Cal. Bus. & Prof.Code § 17204.

Atkins argues that Plaintiff Jung lacks standing because he did not specifically plead that
he saw the advertisements before he purchased tickets. However, the SAC states "Defendants'
actions and omissions  in violation of the FAL were false and misleading such that the general
public is and was likely to be deceived." (SAC ¶ 201). The SAC further states that "As a direct
and proximate result of these acts and omissions, consumers have been and are being harmed.
Plaintiff Jung and the members of the California Subclass have suffered injury and actual out-of-
pocket losses as a result of Defendants' FAL violation because…Plaintiff Jung and the members
of the California Subclass would not have purchased tickets to the Fyre Festival and expended
other sums of money associated with the Fyre Festival if they had known the true facts…[and
purchased tickets and spent money on the Festival] due to Defendants' misrepresentations and
omissions." (SAC ¶ 202). These allegations specifically allege that Jung himself did rely upon
Atkins' statements in deciding to purchase tickets and attend the festival, or at the very least,
viewed in the light most favorable to Plaintiffs, they raise Jung's and the California Subclass'
right to relief above the speculative level.

Even if these statements specific to Jung are deemed to not allege reliance specifically
enough, the SAC alleges throughout the public nature of Atkins' statements, how Atkins is an
influential public figure, and how he "draws in thousands of people to concerts." (SAC ¶¶ 32,  46-
67). These more general allegations, coupled with the more specific allegations specific to Jung,
state plausible grounds for Jung's entitlement to the relief sought.

Atkins also states that "only two statements are attributed to Atkins, and neither
statements could plausibly induce reliance." However the Complaint makes clear that Atkins

made many statements, even if these statements are *also* attributed to the other Defendants. (SAC ¶¶ 32, 46-67). For a discussion of how Plaintiffs' reliance on Atkins' various statements was totally reasonable and plausible, see Section II(E), *supra*.

Lastly, Defendant Atkins even admitted that he engaged in false advertising in connection with the Fyre Festival as he made the following statement relating to the Fyre Festival: "That's not fraud, that's not fraud, False advertising, maybe — not fraud." (SAC ¶ 100).

Accordingly, Plaintiff Jung sufficiently pled reliance on Atkins' statements and such statements reasonably induced Plaintiffs' reliance.

**B.  Plaintiffs State A Claim Under Colorado's Consumer Protection Act**

Plaintiffs state a claim under CCPA because Atkins made statements with knowledge of their untruth and with intent to deceive Plaintiffs.

To prove a private cause of action under the Colorado Consumer Protection Act (CCPA), a plaintiff must show: (1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury. *Rhino Linings, USA, Inc. v. Rocky Mountain Rhino Lining, Inc.,* 62 P.3d 142 (2003). To qualify as deceptive trade practice under Colorado law, "a false or misleading statement must be made with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff." *Campfield v. State Farm Mut. Auto. Ins. Co.,* 532 F.3d 1111, 1120 (10th Cir. 2008) (quoting *Rhino Linings USA, Inc.,* 62 P.3d at 147).

Relevant considerations to determine whether a challenged practice significantly impacts the public include: (1) number of consumers directly affected by challenged practice; (2) relative sophistication and bargaining power of consumers affected by challenged practice; and (3) evidence that challenged practice has previously impacted other consumers. *Rhino Linings USA, Inc.,* 62 P.3d at 149. Misrepresentations that are "directed to the market generally, taking the form of widespread advertisement and deception of actual and prospective purchasers" have been found to satisfy this element. See *Hall v. Walter,* 969 P.2d 224, 234 (1998).

Atkins argues that the SAC does not allege that Atkins intentionally engaged in a deceptive trade practice. However, the SAC thoroughly alleges reasons that Atkins made the statements with knowledge of their untruth, and/or how Atkins made the statements without regard to the consequences, with intent to mislead prospective attendees into believing the Festival would be a "luxury" event featuring all the best in food, music and culture, when he had knowledge that the event would fail and should have been rescheduled for the following year. See Section II(B) and III(A).

Atkins also claims that his fraudulent statements did not have enough public impact to violate the CCPA. However, the "number of consumers directly affected" by his statements was great, because the SAC alleges that Atkins "draws in thousands of people to concerts. The SAC also states that Atkins is an influencer who has a very strong following on Twitter and Instagram with over 200,000 thousands followers on Twitter, and 575,000 followers on Instagram and a large group of recognizable influencer friends," and also alleges abundant details regarding his many public announcements, via social and other media, regarding the Festival. (SAC ¶¶ 32, 46-67). Viewed in the light most favorable to Plaintiffs, these allegations show that thousands of prospective Festival attendees read and relied upon Atkins' statements when they decided to

attend the festival. In addition, these consumers had relatively little sophistication, as Atkins clearly had information far superior to their own, which he completely withheld from them, namely that that the event would fail and even pose dangers. See Section II(B) and III(A). Furthermore, given the breadth of Atkins' fame and social media following, the SAC shows that, viewed in a light most favorable to Plaintiffs, Atkins' fraudulent statements also impacted other consumers. Plaintiffs therefore adequately pled a violation of the CCPA.

**C.** **Plaintiffs State A Claim Under The Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act**

Plaintiffs have stated a claim under the Consumer Fraud Act and Deceptive Trade Practices Act because Atkins willfully engaged in deceptive trade practices and because Plaintiffs sufficiently alleged the likelihood of future harm.

To prove a private cause of action under Illinois' CFA, a Plaintiff must prove "(1) a deceptive act or practice; (2) an intent by the defendant that he rely on the deception, and (3) that the deception occurred in the course of conduct involving a trade or commerce." *Siegel v. Levy Organization Development Co.,* 153 Ill.2d 534, 542 (1992); *Griffin v. Universal Casualty Co.,* 274 Ill. App. 3d 1056, 1065 (1995). Although an action under the Consumer Fraud Act is somewhat similar to a common law action for fraud or misrepresentation, the Act was designed to broaden the common law rules protecting consumers, and should be liberally construed. *Falcon Associates, Inc. v. Cox,* 298 Ill. App. 3d 652 (5th Dist. 1998). Significantly, unlike common law fraud, the Consumer Fraud Act does not require that the plaintiff have relied on the deception. *Siegel,* 153 Ill.2d at 542.

Illinois' Uniform Deceptive Trade Practices Act prohibits deceptive trade practices and unfair competition. *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine,*

44

*Ltd.,* 392 Ill. App. 3d 1 (2009). Injunctive relief under UDTPA is obtainable by an individual consumer where that consumer can allege facts that he likely would be damaged by the defendant's conduct in the future. *Smith v. Prime Cable of Chi.,* 276 Ill.App.3d 843 (1st Dist. 1995). In order to recover attorney fees under the Trade Practices Act, a plaintiff must demonstrate that a defendant willfully engaged in deceptive trade practices. *Tarin v. Pellonari,* 253 Ill. App. 3d 542, 553 (1993).

Atkins states that the SAC does not show that Wilson "actually saw and was deceived by" Atkins' fraudulent statements, per the CFA. However, the SAC alleges abundant details regarding Atkins' fraudulent statements, (SAC ¶¶ 46-67, 252-53),  that these statements were "likely to deceive reasonable consumers," (SAC ¶ 255), that Defendant "intended to mislead Plaintiff Wilson and the Illinois Subclass members and induce them to rely on [Defendant's] misrepresentations and omissions," (SAC ¶ 256), that these acts "caused substantial injury that these consumers could not reasonably avoid," (SAC ¶ 257), and that "as a direct and proximate result of Defendants' unfair…and deceptive practices, Plaintiff and the Illinois Subclass members have suffered and will continue to suffer injury." (SAC ¶ 259). Therefore, viewed in a light most favorable to Plaintiffs, the Wilson and the Illinois read and were deceived by Plaintiffs Atkins' fraudulent statements under the CFA.

As for whether Wilson has shown under UDTPA that Wilson or the other Illinois Plaintiffs are likely to suffer an injury in the future, the SAC alleges that the Illinois Plaintiffs "have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; and increased, imminent risk of fraud and identity theft; and loss of value of their Personal Information." Plaintiffs have

therefore shown likelihood of future injury, and possible entitlement to injunctive relief. Furthermore, Plaintiffs have adequately shown that Atkins' deceptive trade practices qualified as willfull because he had superior access to information that indicated the Festival would be a disaster, and purposely continued to market the Festival, despite this information, see Section II(B). Plaintiffs are therefore also entitled to attorney's fees under UDTPA.

### D. <u>Plaintiffs State A Claim Under The New York General Business Law</u>

Plaintiffs adequately stated a claim under New York's General Business Law because the SAC adequately alleges fraud under Rule 9(b) and because the deceptive transaction occurred in New York.

New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service. *Elacqua v. Physicians' Reciprocal Insurers,* 860 N.Y.S.2d 229, 231 (2008); General Business Law § 349(a), (h). The Act prohibits acts or practices which are "consumer-oriented," that is, an act having the potential to affect the public at large, as distinguished from merely a private contractual dispute. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25 (1995); see *Gaidon v. Guardian Life Ins. Co. of Am.,* 94 N.Y.2d 330, 344 (1999). General Business Law § 349 contemplates actionable conduct that does not necessarily rise to the level of fraud. See, *Gaidon v. Guardian Life Ins. Co. of Am.,* 94 N.Y.2d 330, 343 (1999). "Intent to defraud and justifiable reliance by the plaintiff are not elements" of this claim. *Small v. Lorillard Tobacco Co., Inc.,* 94 N.Y.2d 43, 55 (1998). A defendant's conduct violates the act if it was "deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." *Small,* 94 N.Y.2d at 55. For class action plaintiffs, a deceptive business practice may qualify as sufficiently "in-state" under § 349 if the transaction in which Plaintiffs were deceived

occurred in New York. *Kaufman v. Sirius XM Radio, Inc.,* 751 F. Supp. 2d 681, 688 (S.D.N.Y. 2010).

      Atkins says that Plaintiffs did not allege a deceptive business practice by Atkins. However, because § 349 contemplates actionable conduct that does not necessarily rise to the level of fraud, and because Plaintiffs adequately stated a claim for fraud, see Section III(A), *supra,* Atkins' fraudulent statements would certainly rise to the level contemplated by § 349. See, *Gaidon,* 94 N.Y.2d at 343. Atkins also claims that the SAC inadequately alleges that the New York Plaintiffs read, and were deceived by, Atkins' fraudulent statements. On the contrary, the SAC states that Atkins engaged in deceptive acts, which are set forth in detail, (SAC ¶¶ 187-88), that these representations were "likely to deceive reasonable consumers about the characteristics and quality of the Fyre Festival," (SAC ¶ 189), and that "as a direct and proximate result of Defendants' deceptive and unlawful acts and practices, Plaintiffs and the members of the Class and Subclasses have suffered and will continue to suffer injury and damages." (SAC ¶ 191). Therefore, viewed in a light most favorable to Plaintiffs, the New York Plaintiffs were deceived by Plaintiffs Atkins' fraudulent statements per § 349.

      Claims that the fraudulent conduct did not have sufficient New York ties are similarly without merit. The SAC states that "the deceptive practices with respect to the entire Class occurred in and emanated from New York, where Fyre Media and Fyre Festival were headquartered, and where the individual defendants resided, conducted business and/or had extensive ties." (SAC ¶ 185). The SAC also details how Atkins' fraudulent statements were made using online advertising and social media, which were foreseeably available to, and accessed by New York residents. Accordingly, the SAC plausibly states that the transaction in which Plaintiffs were deceived occurred in New York. *Kaufman,* 751 F. Supp. 2d at 688.

The SAC therefore adequately states a case under General Business Law § 349.

## V. **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant Atkins' Motion to Dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint. In the alternative, the Court should grant Plaintiffs leave to amend the Complaint.

Dated: September 28, 2018                    Respectfully submitted,

By:  s/ Lori G. Feldman
        Lori G. Feldman
**GERAGOS & GERAGOS, APC**
LORI G. FELDMAN (LF-3478)
7 West 24th Street
New York, New York 10010
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
lori@geragos.com

MARK J. GERAGOS (*pro hac vice forthcoming*)
BEN J. MEISELAS (*pro hac vice forthcoming*)
**GERAGOS & GERAGOS, APC**
Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, CA 90017
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
geragos@geragos.com

*Lead Class Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Septembe 28, 2018, I served a copy of **PLAINTIFFS' OPPOSITION TO DEFENDANT JEFFREY ATKINS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** via ECF.

Notice has been electronically mailed through ECF.

Notice has been delivered by mail to the following:

Daniel Sepulveda

Grant Margolin
19 South Drive
Roslyn, NY 11576

/s/ JAMES RIMONTE